RICHARD E. KRIMLOFSKI, APPELLEE, v. HELEN M. MATTERS ET AL., APPELLEES, IMPLEADED WITH MARTHA UERLING, APPELLANT.

119 N. W. 2d 501

Filed February 8, 1963.   No. 35296.

Paul I. Manhart, for appellant.

Swarr, May, Royce, Smith, Anderson & Ross, for appellee Krimlofski.

Heard before SIMMONS, C. J., CARTER, MESSMORE, YEAGER, SPENCER, BOSLAUGH, and BROWER, JJ.

BROWER, J.

This was an action brought in the district court for Washington County, Nebraska, by the plaintiff and appellee Richard E. Krimlofski against the defendant and appellant Martha Uerling and other defendants to quiet title to real estate lying on the west bank of the Missouri River. All defendants except the appellant Martha Uerling defaulted.

The plaintiff's petition sought to quiet title to a tract of land designated in exhibit No. 1 as Tract C, and described by metes and bounds in the judgment of the trial court. The tract is bounded on the west by the centerline of a chute or dry run, on the east by the present west bank of the Missouri River, on the north by the north line of Section 34, Township 17 North, Range 13 East of the 6th P.M., and on the south by the south line of Government Lot No. 1 of said section, assuming both of said lines were extended eastward to the river. The tract contained 81.58 acres. Government Lot 1 or Lot 2 may be referred to simply as Lot 1 or 2.

Plaintiff's asserted claim of ownership was by adverse possession of an island formed in the river and accretion

and reliction east towards the river and the west to the chute.

Defendant by her answer and cross-petition claimed the premises as owner by a chain of title from the United States to said Lot 1 on the west bank of the river and accretion thereto, and adverse possession in herself and predecessors in title. Her cross-petition asked that her title be quieted as against all parties to the action.

A trial to the court resulted in a finding and judgment for the plaintiff. Defendant's motion for a new trial being overruled she has brought the cause to this court on appeal.

The defendant's assignments of error, so far as need be considered by us, are that the judgment is contrary to the law and the evidence. She alleges that the trial court erred in admitting certain evidence but neither in the assignment of error nor the motion for new trial is the evidence referred to set out, though it is alluded to in the argument, and it cannot be considered on appeal.

Since 1912, plaintiff made a hobby of fishing and hunting and protecting wild animals. In 1922, he obtained permission from James Snodderly, the owner of Lot 2 to the south of Lot 1, to use his river-front as a headquarters and boat landing. The landing was about 200 feet north of Snodderly's house. Plaintiff brought there at first two inboard motorboats and rowboats. A road running north out of Florence known as the River Road ran through Lots 1 and 2, leaving about 50 feet of ground between this road and the landing at Snodderly's. In the year 1926, Snodderly gave Krimlofski the land in Lot 2 which lay east of the road. The plaintiff by means of his boats had access to the island from the landing. Snodderly's house burned in 1930 and plaintiff built and paid for another for him with an understanding that he be given Lot 2. Snodderly died without signing any papers and plaintiff later bought the lot at public sale. In 1926, a sandbar had formed an

island east of the Snodderly Lot which extended north beyond the north line of Lot 1, and south in front of the place south of the Snodderly Lot known as the "Burket Place." Lot 1, according to the evidence of plaintiff, had then been washed away except for a few acres. In 1926, plaintiff put duck blinds on different parts of the island. Thereafter, he hunted and fished thereon and invited his friends. He ordered away those not invited and patrolled the island at times. At different times he brought houseboats and installed several places to anchor them on both sides of the island. Further details of plaintiff's evidence as to his occupancy will not be set out as plaintiff's evidence was substantially the same in this action with respect to the premises in suit as it was on his behalf in a previous case in this court concerning the land claimed by Burket lying further south on this same island. Burket v. Krimlofski, 167 Neb. 45, 91 N. W. 2d 57. Plaintiff's witnesses testified much the same as to the occupancy in both cases and there are many photographs in evidence showing the presence of the witnesses at and near the disputed premises and in the plaintiff's boats at outings throughout the years 1926 to 1948.

In 1926, and for many years thereafter, plaintiff and several witnesses testified that a large body of water about 200 feet in width ran between the island and the bank of the river to the west. Plaintiff's houseboats made trips up this waterway and around the island. As the years went by the trees and vegetation grew thereon. The willows held the silt and debris from floods and the island became larger. By accretion and reliction the island extended farther into the river on the east side and towards the shore on the west. This process was greatly accelerated after revetments were built to control the river north of the island in 1936. The western shore extended in the same manner and in time it was divided from the accretion from the island only by a small stream denominated throughout

the case as "the chute." Later except in times of high water it became but a "dry run." Plaintiff testified the trees in the center of the island were larger and tapered off in height toward the chute; and that those on the higher land to the west likewise were larger and became shorter as they approached the chute.

A surveyor who testified for the plaintiff introduced more than 55 maps made by goverment engineers in their work on the river which showed the island, the river on its west, and the growth of the island over the years. Some of the earlier maps show but a small spot where the island was, and on some it cannot be seen. The witnesses however testified that at times the bar was covered by high water. The surveyor also testified the maps made by the government engineers were sometimes made to picture the shore from boats, and islands were not always noticed. In some instances only the shoreline or the main course of the river was desired to be traced. We think these show the island and its growth and acceleration after the time the revetments were built in 1936. Aerial photographs were likewise introduced that tend to show this also.

Defendant produced a witness Andreas Andreason whose testimony sharply conflicted with this evidence. He testified that in 1936 and 1937 he cut and hauled willows over the land involved for government use in riprapping; that Lot 1 and its accretion, from which the defendant's claim stems, extended three-quarters of a mile to the river; that he drove right through it; that there was no chute off the river though water was brought down to the lower areas at times through a creek or draw; and that the so-called "chute" was a dry slough, dry enough on the land in suit to haul willows with a team and wagon to the east river bank.

This conflicts with several maps prepared by the Corps of Army Engineers at different times in 1936. They are numbered in sequence as exhibits 58-16 to 58-22 in which the island in question is plainly shown,

together with the river on the west thereof with its soundings placed on the exhibits. The water at all times shown on those maps appears at least 3 or 4 feet deep and on those dated in July of that year, 12 to 20 feet in depth.

It likewise conflicts with one of the defendant's witnesses who testified that there was a split channel and an island in the year 1936.

The government patent at entry No. 23 of the defendant's abstract of title dated October 16, 1903, shows the area in Government Lot 1 to be 34.20 acres. The deed at entry No. 36, dated September 26, 1910, and another entry No. 37, dated January 18, 1911, both describe Lot 1 as "9 acres more or less with all accretions and increases." It would appear that at this time most of Lot 1 was considered by the grantors to be washed away.

The testimony of the remaining witnesses of the defendant, one her brother-in-law and three her nephews, was largely negative in character. It is to the effect that they were on the premises in question on occasions and didn't see the signs, fences, blinds, or paths testified to by the plaintiff nor did they meet him or anyone thereon at those times. Moreover most of these witnesses did not testify concerning the premises prior to 1940 at which time the nephews were quite young.

The defendant received a deed from Emma Jacobus dated in December of 1949. The premises were therein described as the northeast quarter of the northeast quarter of Section 33, and Lot 1 of Section 34, Township 17 North, Range 13 East of the 6th P.M. No accretion is mentioned therein. The purchase agreement dated in November 1949 between the same parties contains the same description followed by the words "containing 40 acres more or less." In 1955, defendant procured a second deed from Emma Jacobus, dated August 12, 1955, and recorded that day, describing Lot 1 of said section, followed by a metes and bounds descrip-

tion of the land in question to the banks of the Missouri River. The defendant's agent bulldozed plaintiff's fence down in August 1955, which was followed by plaintiff bringing this action on August 19, 1955. Emma Jacobus testified by deposition. She testified that she and her deceased husband, who owned the land as joint tenants, bought it in 1927 or 1928; and that the road then ran at the foot of the hill and the river was right next to the road. They both lived at Florence until his death after which she continued to reside there. At the time of her deposition she lived at the Florence Home for the Aged. The Jacobuses placed no buildings, improvements, or fences on the premises. They had no boats and took no outings or picnics thereon. After her husband's death in 1943 she viewed it from the road only as she drove past it on two or three occasions.

It seems clear that the defendant's predecessor in title was not even conscious of the existence of extensive accretion land when she entered into the purchase agreement with the defendant. Neither is there evidence of any operations on the land in suit by the defendant or her agents after her purchase except the testimony of "walking through" it at infrequent intervals. Her first deed was dated within 10 years of the filing of this suit and no right by adverse possession could accrue during the period of her ownership.

The rules of law applicable to this action are all set out in the case of Burket v. Krimlofski, *supra,* involving similar claims on this same island. We shall now state them. "The claim of title to land by adverse possession must be proved by actual, open, exclusive, and continuous possession under a claim of ownership for the statutory period of 10 years. The possession is sufficient if the land is used continuously for the purpose to which it may be in its nature adapted.

"Title by prescription may be acquired to an island in a stream, which otherwise would belong to a riparian owner. Accretions to an island so held and occupied

for more than the statutory period belong to the owner of the island, and not to the riparian owner to whom the island or a part of it would otherwise belong.

"Land uncovered by a gradual subsidence of water is not an accretion but a reliction. The same law applies to both these forms of addition to real estate which are held to be the property of the abutting landowner.

"Accretion is the process of gradual and imperceptible addition of solid material, called alluvion, thus extending the shore line out by deposits made by contiguous water, or by reliction, the gradual withdrawal of the water from the land by the lowering of its surface level from any cause.

"Where by the process of accretion and reliction, the water of a river gradually recedes, changing the channel of the stream and leaving the land dry that was theretofore covered by water, such land belongs to the riparian owner.

"The fact that accretion is due, in whole or in part, to obstructions placed in the river by third parties does not prevent the riparian owner from acquiring title thereto.

"Where the accretion commences with the shore of the island and afterward extends to the mainland, or any distance short thereof, all the accretion belongs to the owner of the island; but, where accretions to the island and to the mainland eventually meet, the owner of each owns the accretion to the line of contact.

"Land, to be riparian, must have the stream flowing over it or along its border."

From the evidence in this case it appears the claims of the plaintiff as to occupation of the island openly, exclusively, and continuously under claim of ownership for more than 10 years following the late 1920's, were amply proved by the preponderance of the evidence. His use of the island was for the purposes to which it could be adapted. Further we find the preponderance of the evidence shows that the land between the island

and the chute was accretion land attached to the island and not the mainland. Also the defendant failed in her proof concerning any title acquired to the lands in suit by adverse possession.

It follows that the judgment of the district court was right and should be affirmed.

AFFIRMED.

SIMMONS, C. J., not participating.