GERTRUDE C. FITCH, APPELLEE, v. EMIL SLAMA ET AL., APPELLANTS, IMPLEADED WITH NEBRASKA SAVINGS & LOAN ASSOCIATION, A CORPORATION, APPELLEE.

128 N. W. 2d 377

Filed May 15, 1964. No. 35635.

Frost, Meyers & Farnham and Frederick J. Stoker, for appellants.

Jesse D. Cranny and Nanfito & Nanfito, for appellee Fitch.

Morsman, Maxwell, Fike & Sawtell, for appellee Nebraska Savings & Loan Assn.

Heard before WHITE, C. J., CARTER, MESSMORE, YEAGER, SPENCER, BOSLAUGH, and BROWER, JJ.

SPENCER, J.

This is an action brought by Gertrude C. Fitch, plaintiff and appellee, hereinafter referred to as plaintiff or

as Mrs. Fitch, against Emil and Eunice E. Slama, husband and wife, defendants and appellants, hereinafter referred to as defendants or as Mr. and Mrs. Slama, to quiet title to a strip of land 128.25 feet long, and from 1.15 feet to 1.65 feet wide. The defendants are the fee title owners of the disputed strip which is on the west side of their property and borders the east side of the plaintiff's property. The trial court found for the plaintiff and the defendants have appealed.

The evidence shows that the plaintiff became the owner of Lot 27, Block 2 of Pattersons Subdivision of Himebaughs Addition to the City of Omaha, in September 1943. The defendants acquired Lot 28, the lot adjoining Lot 27 on the east, on August 14, 1949. On the plat each lot is shown to be 128.25 feet deep and 50 feet wide. The strip in question is on the west side of Lot 28. The houses on the lots face to the south. There is a concrete block retaining wall on the east side of the disputed strip for the north 73.6 feet. This wall is from one concrete block in height at the north end to three concrete blocks in height at the south end. The south end of the wall is approximately even with and 5.15 feet directly west of the northwest corner of the defendants' house. The defendants' house is on a slight angle and its southwest corner is 5.48 feet from the lot line and 3.83 feet from the east side of the disputed strip. The northeast corner of the plaintiff's house is 9.75 feet from her lot line and approximately 11.45 feet from the retaining wall. The plaintiff's house is longer than the defendants' house and extends back approximately 7.5 feet north of the south end of the retaining wall.

There is a driveway on the east side of plaintiff's property. It consists of two strips approximately 2 feet in width and approximately 3 feet apart, extending north approximately 36.5 feet from the south lot line, where it connects with some concrete squares which angle to the retaining wall where they connect with a concrete platform which is attached to the wall for a distance of

25.35 feet where the platform ends. . .The plaintiff's garage is at the rear of her residence. The garage is not shown on the plat, but from the distances given it is 6.3 feet north and approximately 10 feet west of the end of the concrete platform. This area is covered with crushed rock. The garage is 3.95 feet from her west lot line, 31.05 feet from her north lot line, and 25.75 feet from her east lot line, which at this point is 1.35 feet from the retaining wall. At the time the wall was built in 1915 or 1916, both Lots 27 and 28 were under a common ownership. The concrete platform was laid sometime previous to 1933.

The rest of the evidence is in direct conflict. The plaintiff, over objection, testified that the previous owners of Lot 27 pointed out the retaining wall as her lot line when she purchased the property in September 1943; and that she immediately thereafter started to use the land up to the wall, and did so continuously. The east pole of a clothesline on which she hung her wash was next to the wall and on the disputed strip. This pole was replaced in 1958. At the time it was replaced, it was put west of the disputed strip. Whenever plaintiff used her garage, she drove her car to the garage and then reversed to the retaining wall so as to be able to enter the garage. In this connection, it is discernible that the crushed rock shown on exhibit No. 10 stops short of the wall and is in line with the new clothesline pole which is west of the disputed strip. However, she has not owned a car for some time and did not use the garage for that purpose.

Plaintiff testified that there is nothing next to the wall north of the concrete but grass, which she at all times maintained. She had a survey made in April 1956. She testified that the defendants had had one made shortly before that time. When the defendants had their survey made she was out in the yard and talked to Mr. Slama and his surveyor. She was shocked when the surveyor told her the lot line was west of the

wall. She then offered to reimburse Mr. Slama for the land, but he refused.

It was plaintiff's testimony that she stopped maintaining the grass on the disputed strip after April of 1956 when she had her survey made. Her testimony on this point is as follows: "Well, a discussion came up after it was surveyed, and I just rather thought it was 'no man's land' for awhile, so I just left it alone."

Julia Toberer and Bertha M. Cochran testified that plaintiff had at all times maintained the land up to the retaining wall. Mrs. Charles Caito, plaintiff's niece who lived with her, testified that her husband and her brother at all times subsequent to 1943 cleaned the debris and the snow and cut the grass for the length of the property and on a line with the wall; and that a cherry tree was planted in the corner next to the wall, but it died and was removed. She further testified that the plaintiff would back her automobile up to the wall and then head south. She also testified to the location of the east pole of the clothesline and stated that it was used only by the Fitches.

Charles Joseph Caito testified that he cut the grass to the wall without interference, and that the clothesline pole was used exclusively by the Fitches, and was only a couple of inches from the wall. He further testified that when he cut the grass to the south of the wall, he cut it even with the wall. He also testified that the defendants for a time did have a picket fence south of the wall and that Mr. Slama fixed the wall in 1956 when it collapsed. When Mr. Caito repaired the back fence for the plaintiff in 1958, he put the east post on the lot line, which was a little more than a foot from the wall. Mr. Slama then fenced the area between the rear fence and the wall. This distance as shown on the plat is 1.15 feet.

Brandon H. Backlund, a consulting engineer, testified that he surveyed Lot 28 for the defendants on April 27, 1953. Exhibit No. 4, dated April 28, 1953, is the receipt

given by Backlund to defendants for his surveying fee.

Frank E. Jensen, one of the owners of Lot 27 when it was purchased by the defendants in 1949, testified for the defendants. He was a brother-in-law of the former owner of both properties. He testified that it was his brother-in-law who put in the retaining wall at a time when he owned both properties. After his brother-in-law's death and from 1933 on, he helped his sister maintain Lot 28. After 1933, Lot 27 was owned by other parties. He did the necessary repair work, cleaned out the gutters at least three times each fall, and helped with the yard work. It was his testimony that until 1949 when Lot 28 was sold to the defendants, he had pulled and cut the weeds at least every 3 weeks during the summer on the disputed strip west of the retaining wall because there was no lawn there at that time. It was also his testimony that no one ever questioned his right to be on the strip in dispute. He further testified that in company with the real estate man, he showed Lot 28 to the defendants and pointed out the lot line to them. At that time, Mrs. Fitch was present on her own property, from 6 to 10 feet away. He does not remember whether Mrs. Fitch took part in the conversation, and he does not know if she heard what was said. The driveway on Lot 27 had been used until 1949 to haul coal to Lot 28.

Mrs. Theresa Murphy, who had lived in the vicinity for 36 years, testified that until she moved away in 1952, she saw the defendants pulling weeds and cutting the grass west of the retaining wall; using a ladder on the west side of their house; and working with flowers on the retaining wall, from the west side of the wall.

Mary Rasmussen, a daughter of the defendants, lived with her parents on Lot 28 until 1957. She was with her parents when Mr. Jensen showed them the property. They were west of the retaining wall, and Mrs. Fitch was present. She testified that she worked on flowers from the west side of the wall, and Mrs. Fitch

never complained. Her family maintained the disputed strip, and she never saw any of the Fitches or Mr. Caito mowing or taking care of any of the yard on their side of the lot line. She frequently saw her father clean out the gutters. To do so, it was necessary that he put his ladder up to the lot line.

Mrs. William Rosenau, Mrs. Slama's mother, testified she was present when the property was shown to the defendants, and that Mrs. Fitch was 5 or 6 feet away when the lot line was pointed out to them.

Mr. Slama testified that when Jensen and the real estate man showed them the lot line, Mrs. Fitch took part in the conversation. She was present when Jensen pointed out the expansion joint in the city sidewalk, which was on the lot line. It was his testimony that the defendants strung a line to the clothesline pole west of the wall, and used it through 1949 and 1950. He put a small white picket fence in the front part of the lot to the south of the wall on the lot line, but later took it down because he was afraid the children would fall on it. When he cleaned the gutters on the west side of the house, his ladder extended to the lot line. This was necessary on frequent occasions because of a tree on Lot 27. He pulled weeds, spaded and planted grass in the area west of the retaining wall, and at all times since 1949 has maintained his property to the lot line. He further testified that he started to rebuild the retaining wall in the summer of 1952, and completed it in 1953.

Mr. Slama further testified that he had a survey of the property made in April 1953. This is the survey made by Brandon H. Backlund. Plaintiff was present while the survey was being made and asked, " 'Is that the lot line?' " She then asked him if he would sell her 2 feet of his property, and he told her "no," because it was mortgaged. In 1956 she again asked him if he would sell her 2 feet and he said, "* * * no, I couldn't sell it; and she says, 'You want a 50-foot lot, don't you?' I said, 'Yes.' " He further testified that the plaintiff and

her family in maintaining Lot 27 came only to the lot line, and that he at all times maintained the disputed strip. He also testified that Mrs. Fitch, in backing her car, never came closer than 3 feet to the wall. This statement may be borne out by the fact that the crushed rock shown in exhibit No. 10 appears to be that far west of the wall.

In 1957 or 1958, Mr. Caito replaced the back fence of Lot 27. The old fence was about 8 inches from the wall. When Caito replaced it, he put the east pole on the lot line of Lot 27. Mr. Slama then fenced the area between the plaintiff's back fence and the wall. In 1961, Mrs. Slama and the plaintiff got into an argument about the debris west of the wall. Mr. Slama's testimony is as follows: "My wife called me over and she said that 'Mrs. Fitch here is arguing with me,' she says, 'I asked her to leave the stuff alone, that I would take care of it.' And she said, 'She had the boys there and she told them to remove it, and I told them that I would take care of it myself.' And Mrs. Fitch and her kept arguing back and forth, and my wife told her, 'That is my property.' She says, 'Yes, I know that is your property.' My wife says, 'You swept the walnut shells over on our side.' She says, 'Well, you pick up your dirty mess there,' and she says, 'I could claim that if I wanted to.' " That was the first and only time that Mrs. Fitch ever claimed the property. Shortly thereafter, the defendants received a letter from plaintiff's attorney.

Mrs. Slama testified that Mrs. Fitch was 4 or 5 feet away when Jensen told the Slamas the lot line was 1½ feet west of the wall. It was her testimony that in 1949 the rear fence on Lot 27 was about a foot west of the wall; and that the defendants cut the weeds and grass west of the wall and the Fitches never did. When the 1953 survey showed the Fitch birdbath to be over the disputed strip, the plaintiff moved it so that the lip came only up to the property line. She was present when Mrs. Fitch discussed the 1953 survey with her husband.

It was her testimony that Mrs. Fitch put rocks south of the wall in 1951 and 1952, but only put them along her own lot line. She testified that her husband started repairing the retaining wall in 1952, and at all times used the disputed area. He finished the repair in 1953. Walnut shells dropped from a tree in their yard onto the Fitch property. The Fitches would sweep them up to the wall. In 1961 when she asked Mrs. Fitch about it, Mrs. Fitch said: " 'Well, the walnut shells are yours, so I swept them over on your side. You can take care of them.' "

Defendants list six assignments of error, which may be summed up in the general statement that the evidence is insufficient to sustain the finding of the trial court.

This being an action in equity, it is the duty of this court to try the issue de novo and to reach an independent conclusion as to the merits thereof without reference to the findings of the district court. See § 25-1925, R. R. S. 1943.

Defendants are the fee title owners of the strip in question. The plaintiff, who is the claimant of the property by adverse possession, has the burden to prove her allegations by a preponderance of the evidence. Ferber v. Hines, 111 Neb. 85, 195 N. W. 889. The statutory period for the establishment of title to real estate by adverse possession in Nebraska is 10 years. § 25-202, R. R. S. 1943.

The claim of title by adverse possession must be proved by actual, open, exclusive, and continuous possession under a claim of ownership for the statutory period of 10 years. The possession is sufficient if the land is used continuously for the purpose to which it may be in its nature adapted. Krimlofski v. Matters, 174 Neb. 774, 119 N. W. 2d 501.

A party, in order to establish title to real estate by the operation of the statute of limitations, or in other words by adverse possession, must prove by a pre-. ponderance of the evidence that he has been in actual,

continuous, notorious, and adverse possession of the property under claim of ownership for the full period required by the statute. Dartmouth College v. Rose, 172 Neb. 764, 112 N. W. 2d 256.

It is the visible and hostile possession, with an intention to possess land occupied under a claim that it belongs to the possessor, that constitutes its adverse character. Ordinarily, the hidden or remote view, or the belief of the possessor in taking possession, does not relate itself to the adverse character of the possession. Purdum v. Sherman, 163 Neb. 889, 81 N. W. 2d 331.

Plaintiff's petition alleges that she and the grantors through whom she derived her title have been in actual, open, continuous, peaceful, undisturbed, exclusive, and hostile possession of the disputed strip for more than 15 years last past. Title to land becomes complete in the adverse occupant when he and his grantors have maintained an actual, continuous, notorious and adverse possession thereof, claiming title to the same against all persons for 10 years. Thomas v. Flynn, 169 Neb. 458, 100 N. W. 2d 37. There must be evidence, however, as to the claims of his grantors. There is no competent evidence in this record as to any elements of adverse possession by plaintiff's grantors. Plaintiff produced but two witnesses who were familiar with the property previous to her ownership in 1943. The following is the only testimony remotely connected with this point, in the testimony of Julia Toberer who had lived in the vicinity since 1938: "Q. In all the time that you have lived there have you observed the people that have lived in the Fitch home, either at the present time or the parties before them, maintain the land up to the retaining wall? A. No, the Fitches maintained it."

Bertha M. Cochran, who had lived in the vicinity for 48 years, was asked the following question: "Did the people who resided in the house before the Fitches maintain the property up to that retaining wall?" The following objection was made: "I object to that as

leading and self-serving, no proper and sufficient foundation laid." The court cautioned counsel about the nature of his questions but did not rule on the objection. The answer of the witness was: "That's right."

None of the previous owners were called as witnesses for the plaintiff, and no one testified as to what claims if any they may have made, except the inference to be deduced from the self-serving statement of the plaintiff, to which proper objection was made, that the wall had been pointed out to her as the lot line. Contrasted with this testimony is the positive testimony of Frank E. Jensen, who was one of the owners of Lot 28, that from 1933 to 1949, he at all times maintained the disputed area and no one ever questioned his right to do so. There is no competent evidence in this record which will permit the plaintiff to tack the claim she is making to that of previous owners. We, therefore, review the evidence to determine if plaintiff has proved adverse possession for a period of 10 years, from September 1943, when she acquired the property.

We note that plaintiff's counsel, in argument and in her brief, characterized plaintiff's lack of objection to the use by the defendants of the disputed strip as follows: "The defendants, on the other hand, adduced testimony that attested to the neighborliness of the plaintiff." Defendants are the record title holders of the disputed strip. Why does not this same statement characterize defendants' conduct with reference to the actions which plaintiff contends were indicia of ownership?

In Hoffine v. Ewings, 60 Neb. 729, 84 N. W. 93, we said: "Possession of real estate for a period long enough to ripen into a good title, among other essential elements, must be characterized by opposition to, and inconsistency with, the constructive possession of the legal proprietor, * * *."

The problem herein is created by the retaining wall, which was not put on the lot line. The retaining wall is only on the north 73.6 feet of the lot, yet the plaintiff

claims a strip even with the retaining wall for the entire length of the lot. It is true the concrete platform is connected to the wall for its south 25.35 feet. This was undoubtedly done when the properties were under common ownership. There is absolutely no evidence that the wall was constructed as a boundary-line fence, and this fact cannot be inferred from its mere existence. If we are to speculate on this fact, we could just as logically consider that a concrete wall needs maintenance, and it is reasonable to leave an area for that purpose. At the time of its construction in 1915 or 1916, both properties were under the same ownership, and the widow of that owner still lived on Lot 28 until it was sold to defendants in 1949.

The evidence is clear that north of the concrete platform grass was hard to maintain, and according to Mr. Jensen there was none in the area previous to 1949. The defendants testified to spading the strip and planting grass. The testimony for the plaintiff was merely that they pulled weeds, cut grass, or maintained the area. It is not unusual to cut grass over a lot line. It would be unusual, however, to spade the ground beyond a lot line and to plant grass. This clearly would be an indicia of a claim of ownership.

Mr. Slama testified that Mrs. Fitch took part in the conversation in 1949 when the lot line was pointed out to the defendants. While there may be a serious question as to whether the plaintiff actually joined in the conversation, the evidence is convincing that she was within hearing distance at the time the lot line was pointed out to the defendants.

The plaintiff does admit to a conversation with Mr. Slama at the time he had his property surveyed. She places the date of this survey in 1956, just a very short time before she had her own survey made. Memory often is not too dependable on events which occurred several years previous. The evidence is conclusive that defendants' survey was actually made April 27, 1953.

This date is important because even if we ignore the testimony of Mr. Jensen, who could be considered a disinterested witness, and accept the plaintiff's version of the evidence, the necessary 10 years had not yet expired.

Unless the evidence preponderates that claimants by adverse possession and those through whom they claim have occupied the land in question for the entire statutory period, they are entitled to no relief. See Ferber v. Hines, 111 Neb. 85, 195 N. W. 889.

On the occasion in April 1953, Mrs. Fitch offered to reimburse the defendants for the strip, but the defendants refused to sell. This would be a recognition of defendants' rights. There is nothing to indicate plaintiff was claiming the property as her own at that time except her statement she was shocked to learn where the line actually was. Nothing was said which would indicate to defendants that she was making a claim of any nature. While the plaintiff disputes the date of her removal of the birdbath, whether it occurred after the defendants' survey in 1953 or after her own survey in 1956, it does indicate a recognition of the ownership of the disputed strip by the defendants.

We find several other indications which cannot be ignored. When the clothesline pole was replaced, it was put west of the disputed strip. When the back fence was replaced, the east pole was put on the true lot line. The crushed rock for the garage is not up to the wall, but appears to be on a line with the new clothesline pole. The rocks placed by the plaintiff for a border south of the wall in 1951 and 1952 came only to the lot line according to the testimony of Mrs. Slama. They now stop at a fence put in by the Slamas, according to Mrs. Fitch. No objection was made when the defendants entirely rebuilt the retaining wall, whether it was in 1952 and 1953, as defendants testify, or in 1956, as plaintiff contends. The plaintiff herself in 1956 referred to the strip as "no man's land," and made the

statement in 1961, a few days before defendants received a letter from her lawyer, "I could claim that if I wanted to." This would hardly indicate a claim was being made. These acts certainly do not evidence an actual, continuous, notorious, and adverse possession of the property under claim of ownership as against the actual owner who was using the property when necessary. These acts cannot be passed off as mere neighborliness to excuse the performance of the necessary acts to constitute adverse possession.

The plaintiff had the burden to prove by a preponderance of the evidence those facts necessary to make out a case under her pleadings. This required that proof should preponderate in her favor that adverse possession was taken 10 years prior to the filing of the action; that she entered into possession and did some act or acts, the character of which actually showed she claimed the property as owner; that during such time she did not abandon her claim, but during the whole period continued openly, notoriously, adversely, and exclusively to occupy and claim the property as her own.

Acts of dominion over land must, to be effective against a true owner, be so open, notorious, and hostile as to put an ordinarily prudent person on notice of the fact that his lands are in the adverse possession of another. A mere temporary use of the property by a trespasser at intervals, whether remote or frequent, is not enough. See Dartmouth College v. Rose, 172 Neb. 764, 112 N. W. 2d 256.

As we are required to do, we tried this case de novo and considered the fact that the trial court did inspect the premises in response to the defendants' request. We have reached the conclusion that the plaintiff has not met the burden imposed upon her, and that the judgment of the district court must be reversed and the cause remanded with directions to dismiss the petition.

For the reasons given, the judgment of the district court is hereby reversed and the cause remanded with directions to dismiss the petition.

REVERSED AND REMANDED WITH DIRECTIONS.