LEE SHIRK, ET AL., APPELLEES AND CROSS-APPELLANTS, V.
PETE SCHMUNK ET AL., APPELLANTS AND CROSS-APPELLEES.
218 N. W. 2d 433

Filed May 23, 1974.   No. 39314.

C. Morris Gillespie, for appellants.

Van Steenberg, Brower & Chaloupka, for appellees.

Heard before WHITE, C. J., SPENCER, BOSLAUGH, Mc-COWN, NEWTON, CLINTON, and BRODKEY, JJ.

BRODKEY, J.

This appeal concerns an action brought by the plaintiffs to quiet title to certain land located along the North Platte River in Morrill County, Nebraska. Plaintiffs brought this action under section 34-301, R. R. S. 1943, alleging title to the land in question under the theory of adverse possession and the theory of mutual recognition and acquiescence. See Hakanson v. Manders, 158 Neb. 392, 63 N. W. 2d 436 (1954). The answer filed by the defendants denied that the plaintiffs or their predecessors in title had acquired title to the land in question and separately alleged that the defendants had acquired such title through conveyance and/or through adverse possession. The District Court, after trial and an examination of the premises, found in favor of the plaintiffs on the theory of adverse possession and quieted title to the land in question in them. The defendants appeal alleging basically that the evidence was insufficient to establish the acquisition of title by adverse possession. The plaintiffs cross-appeal assigning as error the failure of the District Court to find that they had acquired title to the land in question through mutual recognition and acquiescence. We affirm the judgment of the trial court.

As has previously been indicated, this action was instituted under the authority of section 34-301, R. R. S. 1943. That statute provides: "When one or more owners of

land, the corners and boundaries of which are . . . in dispute, desire to have the same established, they may bring an action in the district court of the county where such . . . boundaries, or part thereof, are situated, against the owners of the other tracts which will be affected by the determination or establishment thereof, to have such corners or boundaries ascertained and permanently established. . . . Either the plaintiff or defendant may, by proper plea, put in issue the fact that certain alleged boundaries or corners are the true ones, or that such have been recognized and acquiesced in by the parties or their grantors for a period of ten consecutive years, which issue shall be tried before the district court under its equity jurisdiction without the intervention of a jury, and appeals from such proceedings shall be had and taken in conformity with the equity rules." It is well established that section 34-301, R. R. S. 1943, authorizes actions in equity to determine boundaries of *real estate, the ownership of which is in whole or in part in dispute.* McGowan v. Neimann, 139 Neb. 639, 298 N. W. 411 (1941). It is also clear that, when properly pleaded, the theory of adverse possession, as well as the theory of mutual recognition and acquiescence, may be raised under section 34-301, R. R. S. 1943. McGowan v. Neimann, *supra.*

This being an action in equity, it is the duty of this court to try the issues of fact de novo on the record and to reach an independent conclusion thereon without reference to the findings of the District Court. § 25-1925, R. R. S. 1943; Eirich v. Oswald, 154 Neb. 8, 46 N. W. 2d 686 (1951); Fitch v. Slama, 177 Neb. 96, 128 N. W. 2d 377 (1964). Such independent conclusions of fact must be determined by this court in accordance with the ordinary rules governing the burden of proof and the competency and materiality of the evidence. Beckman v. Lincoln & N. W. R.R. Co., 79 Neb. 89, 112 N. W. 348 (1907). A party, in order to establish title to real estate by adverse possession, must prove by a preponderance of the evidence that he has been in actual, continuous, notorious, and

adverse possession of the property under claim of ownership for the full period required by the statute. Fitch v. Slama, *supra*. The statutory period for the establishment of title to real estate by adverse possession is 10 years. § 25-202, R. R. S. 1943. We shall consider the evidence preserved in the record in this case in the light of these rules. However, in so doing, we shall also be cognizant of the rule that on appeal of an action in equity when credible evidence on material questions of fact is in conflict, this court will consider the fact that the trial court observed the witnesses and their manner of testifying and accepted one version of the facts rather than the other. Messersmith v. Klein, 189 Neb. 471, 203 N. W. 2d 443 (1973); State v. Cheyenne County, 123 Neb. 1, 241 N. W. 747 (1932). We may also give consideration to the fact that in this case the trial court personally viewed the premises involved herein. Lackaff v. Bogue, 158 Neb. 174, 62 N. W. 2d 889 (1954).

The land involved in this case as shown in exhibits 3 and 5 received at the trial, consists basically of accretion land situated upon the flood plain of the North Platte River in the area of Chimney Rock in Morrill County, Nebraska. The land, located directly between land owned by the parties herein, lies on the north side of what is presently the main flowing channel of the river. The defendants are joint owners of the land (Lot 6) immediately to the north of the land in dispute, while the plaintiffs hold title to the land (Lot 7) to the immediate south and across the river. The plaintiffs obtained title to Lot 7 from one Bond Benton by warranty deed in 1973. They now contend that they by that conveyance also obtained title to the accretion land involved in this case, the theory being that Benton, their predecessor in title, had obtained title to that land through adverse possession and/or mutual recognition and acquiescence.

Bond Benton, the previous owner of Lot 7, testified on behalf of the plaintiffs. He stated that Lot 7 had

been owned by his mother in the 1920's, and that he first started using the land personally in 1930 or 1931. He indicated that he used the land in question in conjunction with Lot 7 for the purpose of grazing cattle and for hunting. He testified he usually grazed his cattle on that land from June to September of each year, and that between the time the cattle were removed from the land and the hunting season, he would go onto the land in question to build hunting blinds. During the hunting season itself, Benton went onto the land nearly every morning. Benton stated that in all probability he was not on the land at all during the winter months. According to Benton he continued to use the land personally until approximately 1950, at which time he leased it to Ivan Doll as a representative of Johnson-Cashway Company.

The testimony of Ivan Doll supported Benton's representation that in 1950 or 1951 Doll leased Benton's land for hunting and recreational purposes on behalf of Johnson-Cashway Company. Doll stated that Benton's land was used every week during duck hunting season and also that the land was used for picnics and fishing at other times. Such use of the land under the lease to Johnson-Cashway Company continued until 1965 or 1966.

The only persuasive testimony, other than that of Benton relating to the use of the land in dispute during the critical years of the 1930's and 1940's, was the testimony of the defendant, Pete Schmunk. According to his testimony, Schmunk's predecessor in title to Lot 6, located to the immediate north of the land in dispute, was one John Dieckmann. Schmunk testified that he was often on the land in question with Dieckmann between the years from 1939 to 1954. He further stated that he ran cattle on that land with Dieckmann in 1939, and that in order to round up the cattle he went personally to the bank of the main flowing channel of the river. It was not until 1954, however, that Schmunk leased Lot 6 from Dieckmann and occupied that property.

Schmunk actually obtained title to Dieckmann's property in January of 1958. He asserted that from 1939 he has never seen any of Benton's cattle upon the land in question.

A very important element of this case concerns evidence relating to the existence of a fence along the northern boundary of the land now claimed by the plaintiffs, that is, the land in dispute. Bond Benton testified that from the time he first became familiar with his land it was marked by fences and boundaries. Thus, Benton indicated in his testimony that from the time he first became familiar with the land in question, there was a three-strand barbed wire fence along the northern boundary of that land. He considered himself the owner of the land extending up to the point of that fence. Benton further stated that any person going across his property from north to south would necessarily run into that fence. Benton's testimony regarding the fence is supported by the testimony of other witnesses, including that of Ivan Doll, who stated that he regarded the fence as the boundary line of Benton's land and that he had hunted the land accordingly. Even the defendant Schmunk admits the existence of the fence, although he does not know who was responsible for putting it up originally. Schmunk made no representation as to whether or not he saw the fence during the years that Lot 6 was owned by Dieckmann.

The determination of this case necessarily resolves itself into a determination of the weight and persuasiveness of the evidence adduced by the respective parties. It is our conclusion there was sufficient evidence to establish that Bond Benton, the plaintiffs' predecessor in title, obtained title to the land in question through adverse possession in the 1930's and/or the 1940's. We reach this conclusion in spite of the conflict between the testimony of Schmunk and Benton in part because the relationship of Schmunk to the property during the

critical period of the 1930's and 1940's was somewhat more remote than was that of Benton. Furthermore, we are influenced by the strong probative effect of the evidence relating to the fence that extended along the northern boundary of the land in dispute. It is the established law of this state that when a fence is constructed as a boundary line between two properties, and parties claim ownership of land up to the fence for the full statutory period and are not interrupted in their possession or control during that time, they will, by adverse possession, gain title to such land as may have been improperly enclosed with their own. Konop v. Knobel, 167 Neb. 318, 92 N. W. 2d 714 (1958); Olson v. Fedde, 171 Neb. 704, 107 N. W. 2d 663 (1961). The evidence in this case indicates that the fence along the northern boundary of the land in dispute was in existence as late as 1969. The only evidence concerning the time of origin of the fence was the testimony of Bond Benton to the effect that the fence was already in existence when he first became familiar with the land in the early 1930's. Thus, it would appear that the fence was present for the full statutory period. Further, there is ample evidence that Benton claimed ownership of all the land up to that fence. The only evidence that Benton's possession of the land may have been interrupted during the 1930's and 1940's was Schmunk's testimony, contradicted by the testimony of Benton, that Dieckmann had cattle on the land in 1939 and thereafter. However, the fact, as indicated before, that Schmunk's apparent relationship to the land was more remote than that of Benton causes us to resolve the question of whether Benton's possession of the land was interrupted in favor of the plaintiffs. Such a result is particularly required when we consider the fact of the existence and location of the fence along the northern boundary of the land in dispute, since the cattle of Dieckmann would have had to cross that fence in order to graze upon the land in question in the manner de-

scribed by Schmunk. We believe that when all these factors are considered together, the plaintiffs must be held to have adverse possession.

The defendants have argued specifically the evidence was insufficient in that it failed to establish the possession of Benton was open and notorious. This is a contention that we cannot accept in light of the existence of the fence referred to above. "The importance of the inclosure in any case . . . is due to the fact that it renders the possession open and notorious and tends to show that it was exclusive." Brownfield v. Bleekman, 4 Neb. (Unoff.) 443, 94 N. W. 714 (1903). See, also, Hallowell v. Borchers, 150 Neb. 322, 34 N. W. 2d 404 (1948). We also consider in this connection the well-established rule that possession is sufficient if the land is used continuously for purposes for which it may in its nature be adapted. Mentzer v. Dolen, 178 Neb. 42, 131 N. W. 2d 671 (1964); Burket v. Krimlofski, 167 Neb. 45, 91 N. W. 2d 57 (1958). The evidence necessarily leads to the conclusion that the possession in this case was sufficiently open and notorious. We conclude therefore, that Bond Benton's acts of dominion over the property were sufficiently open and notorious to put an ordinarily prudent person on notice of the fact that his lands were in the adverse possession of another. Mentzer v. Dolen, *supra,* Burket v. Krimlofski, *supra.*

The defendants have also argued the evidence was insufficient in that it failed to establish an intent on the part of Bond Benton to claim title to the land in dispute. It is, of course, true that the possession must not only have been actual, open, and continuous, but it must have been under a claim of ownership. Colvin v. Republican Valley Land Assn., 23 Neb. 75, 36 N. W. 361 (1888); Elsasser v. Szymanski, 163 Neb. 65, 77 N. W. 2d 815 (1956). We believe that there was sufficient evidence to establish such an intent on the part of Benton. Benton himself testified to such an intent, and also the plaintiff Juelfs testified that when Benton leased his

land to the plaintiffs, he described it as including the land in dispute.

Our ultimate determination in this case is that the evidence in the record is sufficient to establish Bond Benton, the plaintiffs' predecessor in title, obtained title to the land in dispute through adverse possession. Such being the case, we must affirm the judgment of the District Court to quiet title to the land in question in the plaintiffs. Having made such a determination, we regard it as unnecessary to consider the cross-appeal filed in this case.

AFFIRMED.