FAY TINNIN BARNES, APPELLEE AND CROSS-APPELLANT, v.
HARLAND S. MILLIGAN, APPELLANT AND CROSS-APPELLEE,
IMPLEADED WITH GLAIDETH FRANK ET AL.,
APPELLEES AND CROSS-APPELLEES.

264 N. W. 2d 186

Filed March 29, 1978.   No. 41361.

Michael V. Smith of Smith & King, for appellant.

Edmund Hollstein, for appellee Barnes.

Heard before WHITE, C. J., SPENCER, BOSLAUGH, McCOWN, CLINTON, BRODKEY, and WHITE, JJ.

CLINTON, J.

This action involves title to approximately 1,000 acres of the Tinnin ranch in Sheridan County, Nebraska, of which Fay Tinnin Barnes, plaintiff, is owner of the record title.  She brought this action of ejectment and damages for trespass against the defendant, Harland S. Milligan, record title owner of the adjoining Modisett ranch.  Milligan, in his answer, claimed title to the disputed land (hereinafter

referred to as the Deer Creek land) by adverse possession as successor in title to Phyllis Edmiston and Glaideth Frank, a partnership, and their predecessors in title, the Abbott Company and Stansbie and Engel Company, both corporations. Milligan's cross-petition asks that title to the disputed land be quieted in him.

This case was before this court previously, Barnes v. Milligan, 196 Neb. 50, 241 N. W. 2d 508, upon the issue of whether the trial court had properly rendered summary judgment for the plaintiff. We there reversed and directed trial on the merits. After trial on the merits the District Court again rendered judgment for the plaintiff and the defendant Milligan has appealed. We affirm.

The defendant on this appeal makes and argues assignments of error which are founded upon the following propositions: (1) Where a claimant establishes the open, visible, continuous, and unmolested use of land for 10 years, the use will be presumed to be under a claim of right. The record owner has the burden of rebutting the presumption by proving that the use was permissive. (2) The existence of a fence separating two landowners for more than 10 continuous years, coupled with mutual recognition of and acquiescence in the use up to that fence line, has established the fence as the true boundary line between the two adjoining owners.

The record establishes the following facts. The two ranches, as presently constituted and shown by record title, adjoin. The Tinnin ranch lies to the west of the Modisett ranch. The Tinnin ranch contains approximately 6,500 acres and the Modisett ranch about 50,000 acres.

In 1951, the Tinnin ranch was owned by Fay Tinnin Barnes (hereinafter called Barnes) and the Stansbie and Engel Company, a corporation, owned by Chris Abbott and others. In that year, as a consequence of a partition action in the federal District

Court and a stipulated judgment and exchange of deeds between the parties, Barnes became the record title owner of the Tinnin ranch, as presently constituted, and a portion of the former Tinnin ranch became part of the Modisett ranch, as presently constituted, owned by the Stansbie and Engel Company. Although this division of property was, for the most part, along section lines, running straight north and south, there existed no boundary fence. Barnes, who lived in Texas, was hard to get along with and apparently did not want to participate in the cost of a boundary fence, so none was immediately erected. As a consequence, cattle wandered back and forth between the ranches. Sometime prior to his death in 1954, Chris Abbott constructed a fence on an irregular line consisting of seven different traverses running southwesterly beginning at an arbitrarily chosen point near the north line of the two ranches and ending at a point at least 1.5 miles westerly of the true boundary and at least a mile from the south boundary of the ranches. This fence did not connect with anything and did not provide a fence which would keep cattle from wandering back and forth. Sometime later in the same year, Barnes' foreman, beginning at a point near the south line of the ranches and close to the true boundary, constructed a fence running northwesterly to connect with the fence built by Abbott at its terminal point. These fences have remained in the same locations up until the present time. It is the land lying between the fence and the true boundary which is the disputed land.

In 1962, the Stansbie and Engel Company merged with the Abbott Company and conveyed to it the Modisett ranch. This deed described the Modisett ranch by legal description which did not convey the Deer Creek land. Edmiston and Frank were daughters of Chris Abbott and shareholders in the Abbott Company and officers, secretary and treas-

urer, respectively, of the Abbott Company from about 1960 until 1967. In the latter year the Modisett ranch was conveyed to them in exchange for surrender of their shares in the corporation. They formed a partnership and, using the same legal descriptions as the merger deed, conveyed the Modisett ranch to the partnership. In October 1970, the partnership contracted to sell the Modisett ranch to the defendant Milligan. The contract contained the same legal description used in the prior conveyances. It contained, however, the following provisions: "11. *Additional Assurances.* Certain real estate in Sections 15 and 22, Township 30 North, Range 43 West of the 6th P.M., has been fenced, occupied and used by Seller and its predecessors. Seller will assign and transfer to Purchaser at his request any rights with respect to such real estate that Seller has by reason of its fencing, occupation and use of such real estate." The Modisett ranch was conveyed to Milligan by deed dated April 1, 1971. In the latter part of 1972, Milligan requested a deed to the disputed land. On November 1, 1972, Edmiston and Frank, at the request of Milligan, executed and delivered to him a quitclaim deed to the Deer Creek land. Shortly after delivery of this deed, Barnes began the construction of a fence on the true line. The fence was removed by Milligan. She then began the construction of a second fence on the line. Again the fence was removed by Milligan. This litigation ensued.

It is evident that if title to the disputed land was lost by Barnes and ripened into title in the possessor by virtue of the limitations of section 25-202, R. R. S. 1943, barring the right of action for the recovery of real estate, the limitation occurred during the time possession was in the Abbott Company, which, assuming that the period of adverse possession began with the construction of the fences, would be sometime not later than 1965.

One who claims title by adverse possession must prove by a preponderance of the evidence that he has been in actual, continuous, exclusive, notorious, and adverse possession under claim of ownership for a full period of 10 years. Campbell v. Buckler, 192 Neb. 336, 220 N. W. 2d 248; Shirk v. Schmunk, 192 Neb. 25, 218 N. W. 2d 433.

In Barnes v. Milligan, *supra,* we pointed out: "3 Am. Jur. 2d, Adverse Possession, § 96, p. 177, states: 'Terms such as "claim of right," "claim of title," and "claim of ownership," when used in this connection, mean nothing more than the intention of the disseisor to appropriate and use the land as his own to the exclusion of all others, irrespective of any semblance or shadow of actual title or right. * * * Thus, "claim of right" means no more than "hostile" and if possession is hostile it is "under a claim of right." ' " It is apparent that the terms claim or ownership and hostility describe the same element of adverse possession. We then went on to quote from Purdum v. Sherman, 163 Neb. 889, 81 N. W. 2d 331, and pointed out that adverse possession is founded upon the intent with which the occupant held possession and can best be determined by his acts. We then quoted Purdum v. Sherman, *supra:* " 'It is the nature of the *hostile* possession that constitutes the warning.' " (Emphasis supplied.)

It is the position of Milligan that where, as here, it is clear that his predecessors in possession were in actual, continuous, exclusive, and notorious possession (sometimes we have described this as open possession), then a presumption of claim of ownership arises and the burden of proof shifts to the owner of record title to establish by a preponderance of the evidence that possession was not hostile or under claim of ownership. Milligan asserts that if this principle is properly applied in this case we must come to the conclusion that the possession was hostile or under a claim of ownership.

Milligan's position rests upon statements of this court in Fischer v. Grinsbergs, 198 Neb. 329, 252 N. W. 2d 619, and the discussion in III American Law of Property, § 15.2, pp. 759 to 761, in which the text writer points out that when statutes of limitation bar the claim the record title is extinguished. The writer then adds: "Difficulties have arisen from statements made in the cases that the adverse possessor must have occupied under claim of right; that his possession will not be adverse and will not ripen into ownership under the statute unless he asserts a title adverse to the title of the record owner; that he will acquire no title by adverse possession under the statute if he admits, no matter how casually to third parties, that he knows he has no title to the property, or admits that the real ownership is in the record owner." Concerning this last-quoted paragraph, Milligan says: "The last paragraph highlights the confusion of the trial court in this case. The court should have determined whether or not the possession claimed had been continuous, open, notorious and exclusive for a ten year period, and thereafter required the ousted party to explain the loss of possession." In Fischer v. Grinsbergs, *supra,* a case involving an acquisition of an easement by a prescription, we said: " 'The prevailing rule is that where a claimant has shown open, visible, continuous, and unmolested use of land for a period of time sufficient to acquire an easement by adverse user, the use will be presumed to be under a claim of right. The owner of the servient estate, in order to avoid the acquisition of the easement by prescription, has the burden of rebutting the prescription by showing the use to be permissive.' " Milligan also relies on Butts v. Hale, 157 Neb. 334, 59 N. W. 2d 583.

We do not believe that the principles set forth in the cases cited in the two preceding paragraphs, or in our opinion in Barnes v. Milligan, *supra,* are in conflict.

Notwithstanding the historical discussion in III American Law of Property, sections 15.2 and 15.4, tending to show that "claim of ownership" or "hostility" is not a necessary element of adverse possession, it is clear that this element has, in Nebraska law, always been required. This principle is not contradicted simply because we have frequently held that usually the "hostility" or "claim of ownership" is evidenced by the nature of the possession, Foos v. Reuter, 180 Neb. 301, 142 N. W. 2d 552, and, in the absence of contrary evidence, that is sufficient to sustain the burden of him to claim adverse title. In our discussion in Barnes v. Milligan, *supra,* where we quoted from Purdum v. Sherman, *supra,* and discussed the nature of the possession as giving "notice" of hostility, it was assumed that hostility existed. It is clear that we were not saying that non-hostility could not be shown even where the nature of the possession was sufficient to give notice of hostility. The warning loses its significance if the evidence shows that hostility is not present, because then one of the elements of adverse possession is missing.

A long line of cases make it evident that intent has always been an element in Nebraska. The intent may be either actual or presumed, or inferred from the circumstances. In most cases it is inferred from the circumstances. Colvin v. Republican Valley Land Assn., 23 Neb. 75, 36 N. W. 361 (1888); Smith v. Hitchcock, 38 Neb. 104, 56 N. W. 791; Ryan v. City of Lincoln, 85 Neb. 539, 123 N. W. 1021; Carnahan v. Cummings, 105 Neb. 337, 180 N. W. 558; Ohme v. Thomas, 134 Neb. 727, 279 N. W. 480; McDermott v. Boman, 165 Neb. 429, 86 N. W. 2d 62; Olson v. Fedde, 171 Neb. 704, 107 N. W. 2d 663; Thomas v. Flynn, 169 Neb. 458, 100 N. W. 2d 37; Fitch v. Slama, 177 Neb. 96, 128 N. W. 2d 377; Konop v. Knobel, 167 Neb. 318, 92 N. W. 2d 714; McCain v. Cook, 184 Neb. 147, 165 N. W. 2d 734; Mentzer v. Dolen, 178 Neb. 42, 131 N. W.

2d 671. The intent, even though mistaken, is sufficient as where the claimant occupies to the wrong line believing it to be the true line and even though he does not intend to claim more than that described in the deed. Hammerly v. County of Dodge, 186 Neb. 608, 185 N. W. 2d 452. In the case of prescriptive easements, some elements of possession may sometimes be different, e.g., exclusive use may not under some circumstance be required. Fischer v. Grinsbergs, *supra*. As the cases make clear, actual assertion of claim of ownership is not necessary. However, in the case before us the evidence was such as to permit the trial court to find that the occupiers to the time of the sale to Milligan did not intend to possess as owners.

The evidence in this case would permit the trial court to find that the possession of the Deer Creek land by the Stansbie and Engel Company, its successor, the Abbott Company, and its grantees until the time of the occupation by Milligan was not hostile. In Ryan v. City of Lincoln, *supra,* where the claimed adverse possessor acknowledged he did not intend to possess adversely, we said: " 'The statute of limitations will not run in favor of an occupant of real estate, unless the occupancy and possession are adverse to the true owner and with the intent and purpose of the occupant to assert his ownership of the property. * * *' "

The inference referred to in the preceding paragraph is supported by the following evidence or inferences which may be drawn from the evidence. When Chris Abbott, who controlled the Abbott Company, constructed the partial separation fence sometime between 1951 and his death in 1954, he was under no misapprehension as to where the true line was and he did not intend the fence as a boundary line fence. He knew that for a major portion of its distance, about 2½ miles, the true line followed section lines in a straight north-south line and then at

the north end followed smaller subdivision lines in a generally westerly direction to the Niobrara River. He was an apparently careful man. He was a licensed surveyor and had the necessary equipment to make an accurate survey. The fence was placed where it was merely as a matter of convenience. Any fence erected on the true line would have intersected Deer Creek and would have been constructed in part over very rough land. Abbott ended the fence without enclosing anything and must have expected, or had some agreement with Barnes' foreman, John Dykes, that the latter would erect a fence to meet it. Dykes was deceased at the time of trial. However, the fact that Dykes erected the connecting fence is not disputed.

At the time Abbott caused the corporation's portion of the fence to be built, he declared that he could pay "the old lady" (referring to Barnes) rent just like anybody else. This expressed intention to pay rent was never carried out and that fact may be explained by Abbott's death. There is evidence that, in at least one earlier instance, Abbott caused the corporation to pay unsolicited rent to an owner of a tract which was included within the Modisett fence.

The persons who managed the Modisett ranch after Abbott's death knew, apparently from Abbott, that the Abbott Company did not own or claim to own the Deer Creek land and that this position was understood not as a mere reference to record title, but in the sense that possession was not hostile.

Leases of the Modisett ranch, made after Abbott's death, did not in their legal descriptions include the Deer Creek land.

While the testimony of Edmiston and Frank relates to a period more than 10 years after the fences were constructed, it is corroborative of the evidence of the apparently previously existing intent of their predecessors in title as evidenced by the officers and

agents of the corporation. Edmiston and Frank were secretary and treasurer, respectively, of the Abbott Company from 1960 until 1967 when they personally acquired title. Although their actual knowledge of events before 1967 is not shown, their attitude and intention after they acquired title is clear and seems to be an adoption of the intent which existed earlier. They did not believe in 1967 that they had acquired title to the Deer Creek land. Before the contract with Milligan was signed, they expressly disclaimed ownership, including any claim of title by adverse possession. Milligan acknowledges that he was informed by Edmiston and Frank that they did not claim title by adverse possession; and that they could not sell the property to him because they did not own it. Edmiston and Frank testified that the agreement for the giving of the quitclaim deed was "strictly an accommodation" to Milligan. He apparently wished to lay a clear ground for a claim of adverse possession and establish a clear-cut case of privity.

Milligan contends that the declarations of Abbott cannot be considered, and at trial objected to the evidence of the declaration of Abbott about intention to pay rent on the ground that it constituted hearsay. Declarations of an existing state of mind, if material, are admissible as exceptions to the hearsay rule. § 27-803 (2), R. R. S. 1943. See, also, Lichty v. Clark, 10 Neb. 472, 6 N. W. 760; Sutter v. State, 102 Neb. 321, 167 N. W. 66. The evidence was admissible.

We find it unnecessary to consider Milligan's contention regarding the applicability of section 34-301, R. R. S. 1943, for the reason that it raises no issues which have not been disposed of in the foregoing discussion.

AFFIRMED.