EDWIN G. RENTSCHLER AND MILDRED F. RENTSCHLER,
APPELLANTS, V. JOSEPH J. WALNOFER AND JOYCE
WALNOFER, APPELLEES.

277 N. W. 2d 548

Filed April 17, 1979. No. 42094.

Magnuson, Magnuson & Peetz, for appellants.

Dennis J. Mullin, for appellees.

Heard before KRIVOSHA, C. J., McCOWN, and WHITE, JJ., and KORTUM and FAHRNBRUCH, District Judges.

FAHRNBRUCH, District Judge.

Edwin G. Rentschler and Mildred F. Rentschler,

as plaintiffs, sought to enjoin defendants from removing an alleged boundary fence and prayed that the title to a small parcel of land in Holt County, Nebraska, be quieted in them. After trial, the District Court dismissed their petition and quieted title to the disputed parcel in the defendants. Plaintiffs appeal to this court. We affirm.

The Rentschlers are record owners of the northeast quarter of the northwest quarter of Section 26, Township 31 North, Range 15 West of the 6th P.M. in Holt County, Nebraska, consisting of 40 acres. As far as relevant here, the 40 acres was originally owned in fee by DeWitt Dexter Cotton. He died in 1952. Mr. Cotton's will devised a one-half interest to the 40 acres to his wife, Audrey Cotton, and granted her a life estate in the other one-half interest. Other of Mr. Cotton's devisees received the remainder interest. In 1976, Audrey Cotton deeded her interest in the 40 acres to plaintiffs. The remaindermen, in 1976, deeded their interest in the 40 acres to Edward F. Walnofer and Darlyne Walnofer and to plaintiffs. Edward F. Walnofer and Darlyne Walnofer then conveyed their interest to plaintiffs as joint tenants with right of survivorship and thereafter the plaintiffs deeded the 40 acres to themselves as tenants in common.

The disputed parcel is contiguous to the east boundary of the Rentschlers' 40 acres and is included in the north half of the northeast quarter of Section 26, Township 31 North, Range 15 West of the 6th P.M. in Holt County, of which the defendants Joseph J. Walnofer and Joyce Walnofer are and have been the record owners since 1963.

More precisely, the boundary of the disputed parcel begins at the north quarter section corner of Section 26, proceeds south along the quarter section line a distance of 216.5 feet; thence left, at an angle of 96° 21′, in a southeasterly direction of 91.2 feet; thence left, at an angle of 87° 52′, more or less in a

northerly direction a distance of 226.8 feet to the north section line; thence westerly along the section line a distance of 107.13 feet to the point of beginning. There is an east-west section line county road along the entire north boundary of Section 26. A portion of the area is wooded and has a stream running through it.

In the early 1930's, a fishing club constructed a dam in the northeast quarter of DeWitt Dexter Cotton's 40 acres. The dam was constructed somewhat diagonally from the southeast to the northwest and was located near the east and north boundary of the 40 acres. The dam and impounded water occupied about 5 of the 40 acres. Water was supplied from springs on the Cotton property. The dam was rebuilt in the early or mid-1940's and was rebuilt again in 1977 by Mr. Rentschler after he and his wife acquired title to the 40 acres.

After the dam was originally built, Mr. Cotton orally leased the resultant pond to the fishing club. Records of the fishing club reflecting payments of rent are spotty. There are no records of rental payments in 1946, 1951, 1954, 1963, and 1964. In 1950, the club discussed repairing a bridge and fence on the pond, but the records do not reveal where they were located. James W. Galyen, who became a member of the club in 1947, testified that the fence was along the north border of the disputed parcel and there was a gate there. He fished the Cotton pond each year until the club ceased using the pond. He further testified that there was a gate on the south border of the disputed parcel, which parcel lies directly east of the dam. Fishing club members used the gate on the north boundary of the disputed parcel but not the south border gate. He and others testified that fishing club members sometimes used a gate west of the dam on the Cotton property to gain access to the pond. Galyen further testified that from 1947 to the early 1960's, fishing was gen-

erally confined to the months of April through June and in the fall of the year, due to weather conditions.

Fishing club members drove into the disputed parcel along a vehicle trail, parked their vehicles off the trial, and walked on a foot trail through a grove of trees to the dam where they fished the pond. At one time an outhouse was build on the disputed parcel and a picnic table was located thereon. Both had disappeared several years before trial.

Willia Havranek, a teacher and a niece of the Cottons who had lived with them from 1929 until 1946, held school picnics on the disputed parcel. She testified that a fence was built along the eastern boundary of the disputed parcel prior to 1940. A photo taken at a school picnic in 1940 reflects posts but reveals no wire fence. Mrs. Havranek further testified that a civic club to which she belonged had also held picnics on the disputed parcel.

Plaintiff Edwin G. Rentschler testified that in 1976 he cleaned out some brush from the disputed parcel. He and the defendant, Joseph J. Walnofer, repaired the fence around the disputed parcel. He testified that at that time there was no gate in the north boundary, only an open space, although at one time there had been a gate. The record is silent as to who supplied replacement fence posts and repair wire in 1976. Mr. Rentschler testified that there was a gate in the north boundary fence on July 5, 1977. He grazed his cattle on the disputed parcel in 1976. Mr. Rentschler further testified that in the fall of 1976, defendant, Joseph Walnofer, requested permission to water his cattle in the disputed area, which was granted. Mr. Walnofer denied that he requested such permission, but testified he did water his cattle in the disputed area in the fall of 1976.

It is on the basis of the above facts that plaintiffs claim ownership of the disputed parcel of land under the doctrine of adverse possession by both plaintiffs and their predecessors in title.

Defendants' evidence reflects that the north half of the northeast quarter of Section 26 was owned by one Catherine Seger until her death in 1962. She had acquired ownership from her grandparents, who acquired it under a tree claim. Catherine Seger's husband died in 1956, and her son, Leo F. Seger, then managed the land until his death, which also occurred in 1962. In 1963, the quarter section was sold to Edward F. Walnofer and defendant, Joseph J. Walnofer. Thereafter, the north half of the quarter was conveyed to defendants in the same year.

Defendants' evidence further reflects that in the mid-1940's there was no fence on the north side of the Seger quarter but that there was a fence on or near the north-south quarter section line between the Seger and Cotton properties and that such fence ran north to the county road. A north-south fence was built by Mr. Cotton generally along the quarter section line between the Cotton and Seger properties after the flood in the 1940's.

In September 1953, the east and south sides of the disputed parcel were fenced and a gate was installed in the south boundary fence. The Segers furnished the fence and posts and supplied the consideration to Marion Davis for constructing the fence. Marion Davis' son, Jim Davis, and Joe Mix actually did the work. Jim Davis testified that between 1952 and 1962 he and his father used the disputed area as access to other portions of the Seger property and that he had trapped mink in the disputed area below the dam. He testified that Mrs. Cotton forbid him to fish in the Cotton pond, but said that he could fish below the dam because nobody would bother him there and she didn't have any jurisdiction over that. He stated Leo F. Seger had the disputed area fenced as he did in 1953 because Mr. Seger didn't like to open gates when he went fishing. Mr. Seger became a member of the fishing club in 1946.

After the disputed area was fenced off, Jim Davis

and his father sharecropped hay with the Segers until the early 1960's when the property was sold. They used the disputed area as access to the Seger meadow, stored machinery, and stacked hay there. Earlier in the 1940's, John Hamik rented the Seger land and used the disputed area as a hay meadow. The Walnofers raised hay on the land south of the Seger property and from the 1940's traveled across the disputed parcel to get to their hay. Defendant, Joseph J. Walnofer, testified that at no time did the parking of fishing club members' cars interfere with his use of the disputed parcel. There was testimony that since the 1960's Mr. Walnofer, during portions of the year, kept hay on an underslung on the disputed parcel. Mr. Walnofer paid taxes on the disputed parcel from 1963 each year until date of trial.

Joyce Walnofer testified that she and her family used the disputed area for picnics from 1959 to 1975. Oliver Horton testified that he and defendant, Joseph J. Walnofer, cut wood in the disputed area in 1969 or 1970 and that Mr. Walnofer gave him the wood. Simon Timmerman testified that he was a tenant of the Cotton land from 1953 until 1976. When he first rented the Cotton 40 acres, Mr. Timmerman observed a north-south fence directly east of the dam and that the fence veered toward the west around the dam. He saw defendant, Joseph J. Walnofer, graze cattle in the disputed parcel.

One who claims title by adverse possession must prove by a preponderance of the evidence that he has been in actual, continuous, exclusive, notorious, and adverse possession under claim of ownership for a full period of 10 years. Barnes v. Milligan, 200 Neb. 450, 264 N. W. 2d 186; Campbell v. Buckler, 192 Neb. 336, 220 N. W. 2d 248; Shirk v. Schmunk, 192 Neb. 25, 218 N. W. 2d 433. Such 10-year period is fixed by statute. § 25-202, R. S. Supp., 1978.

In the instant case the record is devoid of plaintiffs' predecessors in title to the 40 acres personally

occupying the disputed parcel. Willia Havranek held some picnics on the disputed parcel, but that was before she had any interest in the property. Her residual 184th title in the Cotton 40 acres was not established until 1952 when DeWitt Dexter Cotton died, and her possessory interest was not established until Mr. Cotton's wife, Audrey, relinquished her life tenancy in 1976. The Cottons' tenant from 1953 to 1976, Simon Timmerman, was never on the disputed parcel on behalf of the Cottons, nor did he ever do anything with it.

Therefore, to be successful in this action in their claim of adverse possession to the disputed parcel, the plaintiffs must first establish that the Cottons leased the disputed parcel to the fishing club and that, as a tenant of the Cottons, the club had actual, continuous, exclusive, notorious, and adverse possession under claim of Cotton ownership for a full period of 10 years. The evidence is lacking to support such conclusion.

Throughout all of the evidence any reference to a rental agreement between the Cottons and the fishing club refer to leasing the "Cotton pond" or "pond." We can find no evidence in the record that Mr. Cotton or his successors even purported to lease the disputed parcel to the fishing club. Minutes of the fishing club of March 31, 1937, negative any suggestion that the fishing club from the inception of the dam and pond to March 31, 1937, leased the disputed area. The minutes reflect: "Planck reported a camp ground on the east side of Cottons (sic) pond had been obtained." Had the fishing club leased the disputed area prior to March of 1937 from the Cottons, it would not have been necessary to "obtain" a campsite. That the Cottons considered they leased only the pond to the fishing club and not the disputed parcel is evidenced by the testimony of Jim Davis quoting Audrey Cotton as saying the pond was a "private pond," but Davis could fish below the pond

because "she didn't have any jurisdiction over that." At that time, Audrey Cotton was the widow of DeWitt Dexter Cotton, had a life tenancy, and owned one-half of the fee title to the Cotton 40 acres.

In the early 1940's, John Hamik, tenant of the Segers, used the disputed area as a hay meadow. In the early and mid-1940's, the Walnofers used the disputed parcel as access to their hay land south of the Seger land. In the late 1940's, the Segers used the disputed area to camp, park their car, and Paul Seger, grandson of Catherine Seger, used it to fish below the dam.

After the dam went out in the early or mid-1940's, according to Paul Seger's testimony, Mr. Cotton built a quarter section fence between his 40 acres and the Seger land. As it approached the north section line road, the fence veered to the west. At that time Mr. Cotton raised milk cows. The Segers raised no cattle. Paul Seger testified that the fence was still there in 1952 but had deteriorated since then. His testimony is corroborated in part by Simon Timmerman, former tenant of the Cottons, and by Jim Davis.

Between 1952 and 1962, the Walnofers used the disputed area as access to hay land south of the disputed parcel; the defendants used it for picnics as did Jim Davis and his family and a school picnic was held there. Jim Davis trapped mink in the disputed area. He, his father, and Leo F. Seger used the disputed land and no one ever tried to keep Jim Davis out of it. It cannot be said that the fishing club members exclusively possessed the disputed property. In Oliver v. Thomas, 173 Neb. 36, 112 N. W. 2d 525, it was said: "Title may not be granted or quieted on the theory of adverse possession in the absence of proof of exclusive possession for a purpose to which the land is adapted for the statutory period of 10 years."

Neither the Cotton nor the fishing club members'

activities were so hostile as to give the Segers or defendants notice of adverse possession by another. In fact, neither the Cotton nor the fishing club members' activities ever interfered with the use of the land by the Segers or the defendants. As was said in Dartmouth College v. Rose, 172 Neb. 764, 112 N. W. 2d 256: " '* * * acts of dominion over the land must, to be effective as against the true owner, be so open, notorious, and hostile as to put an ordinarily prudent person on notice of the fact that his lands are in the adverse possession of another. A mere temporary use of the property by a trespasser at intervals, whether such intervals are remote or frequent, is not enough.' " The mere sporadic parking of cars on the disputed parcel by fishing club members and their walking across the parcel to a fish pond which the club leased from another landowner, all of which did not interfere with the use of the disputed parcel by the title owners, is hardly sufficient under the facts of this case to put an ordinarily prudent person on notice of the fact that his lands are in the adverse possession of another. There is no evidence in the record that the fishing club members had exclusive use of the outhouse or of the picnic table when they were located on the disputed property.

Plaintiffs' evidence also fails to show that the Cottons and their successors, other than the plaintiffs, occupied and possessed the disputed parcel adversely to the record owners with the requisite intent and purpose to assert ownership of the disputed parcel. As was said in Barnes v. Milligan, 200 Neb. 450, 264 N. W. 2d 186: "A long line of cases make it evident that intent has always been an element in Nebraska. The intent may be either actual or presumed, or inferred from the circumstances." Here, the facts militate to the contrary. Plaintiffs' intent could not have formed until 1976 and is well short of the 10-year period for adverse possession.

Plaintiffs' adverse possession claim must fail for

yet another reason. There must be privity of possession of the disputed parcel between the plaintiffs and their predecessors in title for the statutory period. Such evidence is lacking in this case. None of plaintiffs' grantors included the disputed parcel in the calls of their deeds. Such omission in and of itself is not fatal, but in the event of such omission, it is necessary for the plaintiffs to establish privity of possession by competent evidence that they and their predecessors actually occupied the disputed parcel for the full 10-year statutory period. It was said in Bryan v. Reifschneider, 181 Neb. 787, 150 N. W. 2d 900: "Successive occupancies alone do not establish privity but only show a succession of independent trespasses."

Thus, to permit tacking of successive adverse possession of grantees of an area not within the calls of a deed or contract, but contiguous thereto, among the ultimate facts to be established is the intended and actual transfer and delivery of such area to the grantees as successors in ownership, possession, and claim. Privity means privity of possession. It is the transfer of possession, not title, which is the essential element. And, the adverse possession must be continuous. Bryan v. Reifschneider, *supra*.

In the case before us, there was no continuous exclusive adverse possession of the disputed parcel by DeWitt Dexter Cotton while he was alive or thereafter by his devisees. Title owner, Catherine Seger, and her successors in title used the disputed parcel as they desired and for the purposes for which the parcel was suited. Any use of the disputed parcel by the fishing club members was not exclusive and did not interfere with the title owners' use. There is not one scintilla of evidence in the record that after the fishing club stopped leasing the Cotton pond in 1970, any of the devisees of DeWitt Dexter Cotton or anyone in their behalf actually occupied or used any portion of the disputed parcel. Neither is there any

evidence, actual, circumstantial, nor inferential, that any of Mr. Cotton's devisees intended to transfer possession of the disputed parcel. The plaintiffs have simply failed to prove by a preponderance of the evidence that there was the necessary privity of possession between them and their predecessors.

This being an action in equity, it is the duty of this court to try the issues of fact de novo on the record and to reach an independent conclusion thereon without reference to the findings of the District Court. § 25-1925, R. R. S. 1943; Shirk v. Schmunk, 192 Neb. 25, 218 N. W. 2d 433. Such independent conclusions of fact must be determined by this court in accordance with the ordinary rules governing the burden of proof and the competency and materiality of the evidence. Shirk v. Schmunk, *supra*.

In applying those rules, we find that the plaintiffs have failed to prove by a preponderance of the evidence that they have been in actual, continuous, exclusive, notorious, and adverse possession under claim of ownership of the disputed parcel for a full period of 10 years.

The judgment of the trial court is in all respects affirmed.

AFFIRMED.