JULIA WEISS, STANLEY K. WEISS, WESLEY WEISS, AND LARRY WEISS, APPELLANTS AND CROSS-APPELLEES, V. HANS MEYER, PERSONAL REPRESENTATIVE OF THE ESTATE OF FRIEDRICH WILHELM BREDER, HANS MEYER, INDIVIDUALLY, AND GWENDOLYN MEYER, INDIVIDUALLY, APPELLEES AND CROSS-APPELLANTS.

303 N.W.2d 765

Filed March 27, 1981.  No. 43186.

Jacobsen, Orr & Nelson for appellants.

Firmin Q. Feltz for appellees.

Heard before KRIVOSHA, C.J., McCOWN, BRODKEY, and HASTINGS, JJ., and HICKMAN, District Judge.

HICKMAN, District Judge.

This equitable action was brought pursuant to Neb. Rev. Stat. § 34-301 (Reissue 1978) by appellants, here-

after referred to as petitioners, to have the court establish their southern boundary line to the north half of the southeast quarter of Section 28, Township 12 North, Range 37 West of the 6th P.M. in Perkins County, Nebraska. Petitioners also own the entire northeast quarter of the same section, but that land is not involved in this appeal.

Petitioner Julia Weiss is the record titleholder, and petitioners Stanley K., Wesley, and Larry Weiss are her sons and the contract purchasers of the above-described property.

The original respondent, Friedrich Breder, hereafter referred to as Fred, was the record owner of the south half of the southeast quarter of Section 28, Township 12 North, Range 37 West of the 6th P.M. in the same county, which real estate adjoins petitioners' farm on the south. Fred died after entry of judgment by the court on May 23, 1979, and the action was revived in the names of the present appellees, who are the personal representatives of Fred's estate and the devisees of the real estate involved under his will.

The dispute between the parties arose when Fred, in his answer, claimed by adverse possession for the statutory period certain of the petitioners' property up to a certain farming line.

The trial court, after hearing the evidence, found that Fred had indeed acquired a part of the ground he claimed by adverse possession, but not all of it. Petitioners were not happy with losing their land and Fred was not happy with getting less than he claimed. This situation brought about petitioners' appeal and the cross-appeal by the appellees. In addition, the appellees have filed in this court a motion to dismiss petitioners' appeal.

Petitioners contend that the trial court erred (1) in failing to find that Fred's use of the disputed tract was an occasional trespass; (2) in finding that Fred acquired title to the disputed tract by adverse possession; (3) in finding that Fred's use of the disputed tract was that

for which the land was adapted; and (4) in failing to find that the boundary line separating the properties of the parties was a straight line running east and west from the southwest corner of the north half of the southeast quarter to the southeast corner of the north half of the southeast quarter.

In actions in equity, it is the duty of the Supreme Court to try the issues of fact de novo on the record and to reach an independent conclusion thereon without reference to the findings of the District Court. *Layher v. Dove*, 207 Neb. 736, 301 N.W.2d 90 (1981).

"One who claims title by adverse possession must prove by a preponderance of the evidence that he has been in actual, continuous, exclusive, notorious, and adverse possession under a claim of ownership for a full period of 10 years." *Layher v. Dove, supra* at 739, 301 N.W.2d at 92. The statutory period in Nebraska is 10 years. Neb. Rev. Stat. § 25-202 (Reissue 1979). " 'In Nebraska the law is settled that the operation of the statute of limitations is to vest absolute title in the occupant, when he has maintained an actual, continued, notorious, and adverse possession under claim of ownership for the statutory period.'" *Walker v. Bell*, 154 Neb. 221, 222, 47 N.W.2d 504, 505 (1951). "Claim of ownership," as used in the law of adverse possession, means nothing more than the intention of the occupant to appropriate and use the land as his own to the exclusion of all others, irrespective of any semblance or shadow of actual right or title. *Barnes v. Milligan*, 200 Neb. 450, 264 N.W.2d 186 (1978). "In determining the rights of an adverse owner, the entry and possession of his tenant, expressly authorized to act, is the entry and possession of such owner." *Cassens v. Wisner*, 122 Neb. 408, 240 N.W. 526 (1932) (syllabus of the court). Adverse possession is founded upon the intent with which an occupant held possession, and can best be determined by his acts. *Purdum v. Sherman*, 163 Neb. 889, 81 N.W.2d 331 (1957). The intent, even though mistaken, is sufficient as where the claimant occupies to the

wrong line believing it to be the true line and even though he does not intend to claim more land than that described in the deed. *Barnes v. Milligan, supra.* The real purpose of prescribing the manner in which an adverse holding will be manifested is to give notice to the real owner that his title or ownership is in danger so that he may, within the period of limitation, take action to protect his interest. It is the nature of the hostile possession that constitutes the warning, not the intent of the claimant when he takes possession. *Purdum v. Sherman, supra.* The law does not require that possession shall be evidenced by a complete enclosure, nor by persons remaining continuously upon the land and constantly from day to day performing acts of ownership thereon. It is sufficient if the land is used continuously for the purposes to which it may be in its nature adapted. *James v. McNair,* 164 Neb. 1, 81 N.W.2d 813 (1957); *Lantry v. Parker,* 37 Neb. 353, 55 N.W. 962 (1893). In this respect, "Ordinarily the law does not undertake to specify the particular acts of occupation by which alone title by adverse possession may be acquired since the existence and establishment of the continuity must necessarily depend greatly on the circumstances of each case, and the use to which the property is adapted, the actual manner of its use, the circumstances of the occupant, and to some extent his intention must be considered. It is enough, however, that the land be devoted to the ordinary uses of the adverse claimant provided the uses are such as to put the true proprietor on notice." 2 C.J.S. *Adverse Possession* § 125 at 681 (1936), now 2 C.J.S. *Adverse Possession* § 150 at 866 (1972).

Petitioner Julia Weiss acquired title to the property in 1943 by virtue of a referee's deed, although the land had been in the family since it was homesteaded by her father. Julia and the contract purchasers all appear to have been and now are absentee owners and have continuously paid the taxes thereon. The petitioners' cultivated land which is to the north of the disputed tract

has been tilled by the present tenant and was originally broken from sod by the tenant's father before him under the auspices of Julia's father. The disputed tract is the southern portion of the north half of the southeast quarter and, until 1974, was in its natural state, that is, unbroken and producing the natural grasses so commonly found in Nebraska. Fred's adjoining land to the south also existed in its natural state until 1974.

It appears that the land surrounding that of Fred and the petitioners was at all times suitable to cultivation and crop production, and the topography and soil content are essentially the same as that of the land of the parties to this action.

A road runs along the east side of both properties, and there is a road along the south side of Fred's property. The west side of both properties is divided by a neighbor's fence, and there is some discussion in the record that there was a gate post in the vicinity of the north-south division line which allowed entrance to the neighbor's field to the west, although the testimony as to the location of this post is purely speculation on the part of the witnesses.

The petitioners' tenant, John Froschheiser, and his father before him created, by the use of cultivation equipment, a farming line north of the actual property line established by the deeds, and this line has existed for perhaps 60 years. To the south of the farming line the natural grasses grew, and there was no fencepost, fencing, ditch, or other monument by which anyone could accurately determine where the division line between the north half and the south half of the southeast quarter lay. Fred directed his tenants or custom hay cutters to mow the hay up to the farming line and, after it cured, the hay was pulled together in stacks on his land or was baled and picked up.

In several of the drought years in the 1930s, the grass was too sparse to mow, and in other years, none of which are set forth with clarity, the grass on the disputed tract was only spot cut. In good years all of the grass was

mowed, cured, and then baled or stacked on Fred's land.

Petitioners' tenant has observed Fred's crews cutting hay each year that the hay was cut and states that it took from 4 days to 3 or 4 weeks to mow, cure, and stack the hay from both Fred's ground and the disputed tract, depending upon the weather: "Q. . . . Mr. Froschheiser, did you have an opportunity to observe the actual hay cutting at any time during the 60 years or so you farmed the Weiss Farms property? The hay cutting that went on this hayland that we are speaking of? A. Yeah, I was there every year."

Petitioner Stanley Weiss testified that he was assisting his mother in handling the farm and became aware of the boundary problem in the early 1960s, before 1965, but did not advise her of the problem because he did not wish to put a strain on his mother. Stanley and his brothers did not become contract purchasers until 1975.

It is evident that Stanley was acting as his mother's agent prior to his becoming one of the contract purchasers, and thus his knowledge of the boundary problem before 1965 is imputed to Julia under the doctrine of agency.

The evidence indicates that the invasion onto the disputed tract by those under Fred's direction lasted from 4 days to 4 weeks depending upon the weather and then only once a year for the purpose of making hay. It is obvious from the evidence that Fred and those operating under his direction were mistaken as to the location of the boundary of Fred's property. It is equally apparent that for 60 or so years the petitioners' tenant was aware that each year Fred was taking the hay up to the farming line established by the tenant and his father before him.

Petitioners complain that the court erred in finding that Fred was using the land for the purpose for which in its nature it may be adapted, that is, to crop production.

Fred was using his own land to the south as hay land, one of the uses to which the land was adaptable, as he had a right to do. In Nebraska such grasses usually lend themselves to only an annual cutting. Although most of the neighboring land was being used for crop production, it was in its natural state adapted to the production of hay. Production of hay for feed is a vital part of the farming industry as it was 60 years ago. As long ago as 1893, we stated: "In the case of arable land it is not necessary, in order to hold possession, that one should continuously have a crop in the ground. It is sufficient if, during the seasons of the year when crops are grown, the land be used for that purpose; and from harvest to seed-time one's possession is not interrupted, although during that period no acts of ownership may be exercised." *Lantry v. Parker*, 37 Neb. 353, 356, 55 N.W. 962, 963 (1893).

There is no evidence that the petitioners or their tenants have used or been on the disputed tract from the time the farming line was established until 1974, and the fact that Julia and her father paid the taxes is not determinative, but only an element and circumstance which may be considered, together with all the circumstances of the case, with respect to the subject of adverse possession. *Dunnick v. Stockgrower's Bank of Marmouth*, 191 Neb. 370, 215 N.W.2d 93 (1974).

We hold that, under the facts of this case, the annual production of hay by Fred or those under his direction for 60 or more years was more than an occasional trespass and was sufficient to constitute adverse possession.

Since it is evident that land may be generally adapted to more than one use, we hold that if the land is used for one or more of the major purposes for which it may by its nature be adapted, that use will be sufficient to establish continuity of possession, provided such use is sufficient to put the record titleholder on notice.

Finding no merit to the petitioners' assignments of error, we turn to the cross-appeal of the appellees. Petitioners argue that appellees failed to file a motion

for a new trial and thus this court can only determine whether or not the pleadings support the judgment rendered. This may have been the law prior to February 6, 1981, but this court in *Petersen v. Petersen, ante* p. 1, 301 N.W.2d 592 (1981), held that an appeal from a judgment in an equitable action does not require the filing of a motion for a new trial for a de novo review in this court of alleged errors in the findings and judgment of the trial court. We therefore review the findings and judgment of the trial court for possible error pursuant to the cross-appeal.

Appellees contend that there is a variance between the evidence and the findings and order of the trial court. Appellees would have us rely on a surveyor's certificate attached to their motion to dismiss; we observe that the surveyor's certificate made after the trial of this case is not part of the record and will not be considered. The only competent evidence in the record relating to distances from which the lower court could establish a boundary was the testimony of Charles D. McCullough, director of the local A.S.C.S. office, and his affidavit. Under his supervision, aerial photographs of the land involved were measured. This witness was frank to admit that measurements from the aerial photographs were subject to an error factor of less than 1 percent, which translated into 15 to 20 feet. The District Court found that the burden of proof was on Fred to establish his claim of adverse possession and that Fred was entitled to "only the lesser of the land established by his proof." Taking into consideration the error factor testified to by McCullough and the fact that the point at which the rule or measuring device was laid on the aerial photographs when measurements were made on the 1960 and 1966 aerial photographs is unknown, we cannot say as a matter of law that the trial court was clearly wrong in its location of the boundary line as described in its findings. It would serve no useful purpose to set out in this opinion the trial court's findings without the reader having the benefit of

the various exhibits to compare with it.

Subsequent to the entry of judgment by the District Court, and while this case was pending on appeal, the appellees filed a motion to dismiss the petitioners' appeal based upon the allegation that the petitioners had accepted the benefits of the decree of the District Court. It appears that, following the entry of the decree, petitioners' tenant, at the request of the petitioners, had the land surveyed in accordance with the findings of the District Court, installed several posts on the boundary line as established by the District Court, and thereafter tilled and cropped up to that line. No fencing was attached to the several posts to connect them. Petitioners claim the setting of the posts was a temporary act pending resolution of the appeal and was done to prevent further crowding onto their land by appellees. We find that petitioners' act, through their tenant, in setting several posts was one of self-protection and was not done with the intent to accept the benefits of the decree of the District Court. Appellees' motion to dismiss is thus overruled.

Under the facts and circumstances of this particular case, we find that the judgment of the District Court should be affirmed, the cross-appeal dismissed, and the motion to dismiss the appeal overruled.

AFFIRMED.