JAMES A. MCCAIN ET AL., APPELLEES, V. EDNA C. COOK ET AL., APPELLANTS, IMPLEADED WITH JOHN DOE, REAL NAME UNKNOWN, APPELLEE.

165 N. W. 2d 734

Filed March 7, 1969. No. 37094.

Wright, Simmons & Hancock, for appellants.

Marvin L. Holscher, for appellees McCain.

Heard before WHITE, C. J., CARTER, SPENCER, BOSLAUGH, SMITH, McCOWN, and NEWTON, JJ.

WHITE, C. J.

This is a boundary dispute turning on the overlapping questions of adverse possession and mutual recognition of a boundary line fence for the statutory period of 10 years.

Plaintiffs McCain are the record title holders of two lots of unbroken pasture land bordered by the west line of Section 6, Township 22 North, Range 55 West of the 6th P.M., Scotts Bluff County, Nebraska. Adjoining on the west the defendants Cook own (and have since 1945) Lots 1 and 6, Section 1, Township 22 North, Range 56 West of the 6th P.M., Scotts Bluff County, Nebraska.

South of both properties is rough, partially tree-covered accretion land stretching to the bank of the North Platte River. The cleared Cook land is largely cultivated, there being a strip or sliver of pasture land lying between the north and south areas of cultivation. Until quite recently (1965-1966), the Cook land was cultivated only to the true surveyed section line. It is this central fact around which much of the dispute turns. To the east of the surveyed section line (and until recently the line of cultivation), there is an existing fence, beginning at the northwest section corner that runs slightly to the southeast to the edge of the accretion land to the south, forming a triangular strip of 5.09 acres that is the precise area in dispute in this action. There is no existing fence on the section line. There is much evidence in this case concerning different fences that had existed in the past for short distances on the true section line.

There are a few significant and almost undisputed facts that we deem controlling in the disposition of this case. The existing fence line on the east border of the triangular strip has been in uninterrupted existence for at least 40 or 50 years, and probably since the 1880's. Samples of the barbed wire from this fence show that they were brand patented in 1880 and 1877 and are not galvanized or rust protected. Modern barbed wire is. The aerial photographs reveal a clearly marked, dark-appearing fence running in a straight unbending line from the northwest corner post to the border of the tree-covered accretion land. This fence line is and has been for many years heavily interlaced with brush, high grass, and other indications of a permanent existence much longer than the statutory 10-year period.

The evidence is undisputed that Cooks and their predecessors in title had repaired and strengthened this fence, and had at times installed sheep tight woven wire. Many years ago new posts had been installed. The evidence, although somewhat disputed, shows by a preponderance that the land in the strip had a swale or slough running

through it, was lower and rougher than the cultivated land which for many years has been leveled and is crop producing. The evidence is overwhelming that this triangular strip and the east-west strip intervening between the cultivated areas has been used by Cooks and their predecessors for running and pasturing cattle and sheep for more than 20 years. The fence was strengthened and tightened to retain them on the Cook property.

Perhaps the most significant testimony in this case is that of James Haycraft, former livestock business partner of plaintiff James A. McCain, who has been on the property for over 27 years and who, although first refusing, finally and reluctantly appeared as the last witness in the case. This witness testified that in the 27 years he was on the property the east fence had been in existence; that either the Cooks or Johannes (Cooks' predecessor) had run sheep and cattle in the disputed area to the existing fence line; and that when he came on the property he regarded this east fence as the boundary line. During all of this period he ran cattle to this fence line and Cooks and Johannes ran cattle "up against it" from the west. There was a slough running through the disputed area. This now has been leveled and filled in by the Cooks.

This witness' evidence and other testimony establish that there had been a fence running north on the east edge of the alfalfa or cultivated land close to the true section line. This fence was not over 100 to 200 yards long running north to south. It was an old fence, so undiscernible that Haycraft became caught in it with his horses, and he asked Johannes, then the owner, why he had it there. It was only there about 2 years. It was used with the east existing fence as a channel or conduit to run cattle and sheep back and forth to the north and south and to the east of the crop land. There was at one time an east-west cross fence joining this fence on the north, that was used as a "catch pen" and at least on one occasion Haycraft had used it to separate

his strayed cattle and return them to the McCain property east of the east fence line.

There is much evidence concerning Cooks' recent action (1967-1968) in removing trees, posts, and wire in the area of this old fence, McCains contend that Cooks moved the boundary line fence. Haycraft's testimony undercuts this contention and there is no evidence of the use of this fence as a boundary line or as separating the use of the properties. The fact that it was erected a few feet from the surveyed section line is the only support to be found for this contention. Also significant is that it never ran from the northwest section corner. The east existing fence always ran and began at the northwest corner post.

Summarizing, the evidence overwhelmingly supports the conclusion that for many more than 20 years the east existing fence line has been in existence, has been used and in fact recognized as the true boundary line by the parties and their predecessors in title, and that the 5.09-acre disputed strip has been used exclusively, continuously, and adversely under a claim of ownership by the Cooks and their predecessors.

In Olson v. Fedde, 171 Neb. 704, 107 N. W. 2d 663, this court said: "It is the established law of this state that, when a fence is constructed as a boundary line between two properties, and parties claim ownership of land up to the fence for the full statutory period and are not interrupted in their possession or control during that time, they will, by adverse possession, gain title to such land as may have been improperly enclosed with their own. See, Pfeiffer v. Scottsbluff Mortgage Loan Co., 105 Neb. 621, 181 N. W. 533; Krumm v. Pillard, 104 Neb. 335, 177 N. W. 171; Hallowell v. Borchers, supra; Konop v. Knobel, 167 Neb. 318, 92 N. W. 2d 714; McGowan v. Neimann, 144 Neb. 652, 14 N. W. 2d 326." See, also, Hakanson v. Manders, 158 Neb. 392, 63 N. W. 2d 436. The evidence, as outlined, fully establishes Cooks' title under the above holding. Nor is a party required to expressly

declare during his occupancy, that he claims to be the owner to the existing fence line. It is not necessary that the possession be accompanied by an express declaration or claim of title; it is sufficient if the party in possession has acted so as to clearly indicate he did claim title. The intention to claim title is usually manifested by acts, not words. Woodcock v. Unknown Heirs of Crosby, 92 Neb. 723, 139 N. W. 646; Krumm v. Pillard, 104 Neb. 335, 177 N. W. 171. See, also, 3 Am. Jur. 2d, Adverse Possession, § 101, p. 184; Konop v. Knobel, 167 Neb. 318, 92 N. W. 2d 714.

McCains rely heavily, as we feel the trial court did, on a conversation James A. McCain had with the then owner, in 1966, in which the owner stated: "When are we going to get that fence line surveyed? If it is on me I will pay for it; If it is on you you pay for it. My health isn't the best and I would like to get this straightened up." In Converse v. Kenyon, 178 Neb. 151, 132 N. W. 2d 334, a strikingly similar case on the facts, this court said: " 'The fact that one claiming title by adverse possession never intended to claim more land than is called for in his deed is not a controlling factor. *It is the intent with which possession is held, rather than the intention to hold in accordance with the deed, that is controlling.'* * * *

"In 3 Am. Jur. 2d, Adverse Possession, § 240, p. 339, it is said: 'After the running of the statute, the adverse possessor has an indefeasible title which *can only be divested by his conveyance of the land to another,* or by a subsequent disseisin for the statutory limitation period. *It cannot be lost by a mere abandonment, or by a cessation of occupancy, or by an expression of willingness to vacate the land, or by the acknowledgment or recognition of title in another, or by subsequent legislation, or by survey.'*

"In Martin v. Martin, 76 Neb. 335, 107 N. W. 580, 124 Am. S. R. 815, this court held: 'One who has acquired absolute title to land by adverse possession for the statu-

tory period does not impair his title by thereafter paying rent to the owner of the paper title.' In the opinion of the cited case it was stated: 'The law is well settled that recognition of title in the former owner by one claiming adversely, after he has acquired a perfect title by adverse possession, will not divest him of title.' " (Emphasis supplied.)

As we have demonstrated, Cooks in 1966 had long since acquired title to this property, either by boundary line acquiescence or adverse possession, or both. Their title could be divested by nothing short of a validly executed deed, by adverse possession, or by other legal means not pertinent here.

The judgment of the district court quieting title in McCains is reversed and the cause remanded with directions to dismiss McCains' action and quiet title to the disputed acreage in the Cooks.

REVERSED AND REMANDED WITH DIRECTIONS.