IN THE NEBRASKA COURT OF APPEALS

**MEMORANDUM OPINION AND JUDGMENT ON APPEAL**
**(Memorandum Web Opinion)**

TAYLOR V. SIDES

NOTICE: THIS OPINION IS NOT DESIGNATED FOR PERMANENT PUBLICATION
AND MAY NOT BE CITED EXCEPT AS PROVIDED BY NEB. CT. R. APP. P. § 2-102(E).

TREVOR TAYLOR AND LINDA TAYLOR AS TRUSTEES OF TNT
LIVING TRUST, A REVOCABLE TRUST, APPELLANTS,

V.

MICHAEL SIDES ET AL., APPELLEES.

Filed February 7, 2023.    No. A-22-126.

Appeal from the District Court for Red Willow County: DAVID W. URBOM and PATRICK
M. HENG, Judges. Affirmed.

Matthew D. Pederson, of Pederson Law Office, for appellants.

Melodie T. Bellamy, of Bellamy Law, for appellees.

MOORE, BISHOP, and WELCH, Judges.

BISHOP, Judge.

## I. INTRODUCTION

Trevor Taylor and his mother, Linda Taylor, (the Taylors), appeal from an order of the Red
Willow County District Court which quieted title to certain disputed real property in Michael Sides
and his wife, Marsha Sides (the Sideses). We affirm.

## II. BACKGROUND

The Taylors owned the northeast quarter section of rural property immediately to the north
of property owned by the Sideses in the southeast quarter of the same section. The Taylors claimed
the boundary line between the two properties was along the section line between the two properties.
The Sideses claimed their northern boundary line was established by a fence that ran slightly north
of the section line for almost a quarter section before dipping south of the section line.

- 1 -

## 1. Parties and Disputed Property

In 2000, "the Northeast Quarter (NE¼) of Section Eleven" became available for purchase. The Taylors purchased the property and a warranty deed was filed in January 2001, conveying to the Taylors property described as "[a]ll that land in the Northeast Quarter (NE¼) of Section Eleven (11), Township Three (3) North, Range Twenty-seven (27) West of the 6th P.M., Red Willow County, Nebraska, lying south of the right-of-way line of the Burlington Northern Santa Fe Railroad, except" a certain tract of property along with an "easement for a right of way" (the Taylors' property).

In 2018, the Sideses purchased the property directly south of the Taylors' property from Paul Schaffert, who rented it from the 1980s until 1991, when he purchased it. A deed was filed on February 23, 2018, conveying to the Sideses a property described as "Lots Three (3), Four (4), and Part of Lot Five (5), located in Section Eleven (11), Township Three (3) North, Range Twenty Seven (27), West of the 6th P.M., in Red Willow County, Nebraska" (the Sideses' property).

As previously noted, the Taylors' property and the Sideses' property share a boundary located at the southern edge of the Taylors' property and the northern edge of the Sideses' property. According to the deeds conveying the Taylors and the Sideses their respective properties, the boundary ran along the quarter section line. However, an old fence ran east to west, beginning slightly north of the quarter section line in the southeast corner of the Taylors' property, and running north of the section line almost the full length of the quarter section until it dips slightly south of the section line at the northwest corner of the Sideses' property. Throughout this opinion, we refer to the property between the quarter section line and the fence north of the quarter section line as "the disputed property."

## 2. Complaint and Counterclaim

On October 31, 2018, the Taylors, as Trustees of the TNT Living Trust, filed a "Petition and Complaint" in the district court against the Sideses and "all persons having or claiming any interest in and to [the disputed property]." The Taylors alleged that the Sideses removed a fence that the Taylors were constructing on the disputed property along the quarter section line. They alleged that the Sideses received notice of the Taylors' intent to construct the fence. The Taylors asked the district court to enter an order quieting title to the disputed property in them. They also asked that the court award them $6,267.03 in damages for loss caused by the Sideses' removal of the partially constructed fence.

On November 30, 2018, the Sideses filed an "Answer and Cross Complaint," generally denying the allegations contained in the Taylors' complaint. In their "Cross Complaint" (counterclaim), the Sideses alleged that "[a]long the north side of [the Sideses'] property is a boundary line fence delineating the north[ern] boundary of" the Sideses' property. The Sideses further alleged that they and their "predecessors in title . . . used the land for cattle pasture purposes and recreation[al] purposes[,] and have been in actual continuous, exclusive, notorious, and adverse possession under claim of ownership for more than ten years." As such, when the Taylors crossed south of the fence and began erecting a new fence, they trespassed on the Sideses' property and were liable for damages for "attempting to move or destroy the established boundary line" on the north side of the Sideses' property. The Sideses asked the district court to enter an order "establishing the boundary between" the Taylors' property and the Sideses' property, and also

requested an "injunction restraining" the Taylors from erecting a fence on the disputed property and "entering onto [the Sideses'] property in the future."

### 3. BENCH TRIAL

On May 4, 2021, the district court held a bench trial on the matter. The court heard testimony from numerous witnesses, including the Taylors and Michael Sides. The court also received into evidence exhibits consisting of deeds, surveys, photographs, maps, letters, and receipts. We now set forth the evidence relevant to the issues on appeal.

### (a) Parties' History

The Taylors testified that when Schaffert owned the Sideses' property, they did not have "any issues" regarding the boundary separating their properties. Linda Taylor testified that the Sideses also owned the property to the north of their property. Linda stated that the Sideses constructed a building that crossed onto their land. The issue was resolved when the Sideses conveyed a tract of their property to the Taylors in exchange for the land they had built on. However, another "problem" arose when the Sideses purchased the property to the south. Trevor Taylor testified that there was a gate they relied upon to secure their property, although the gate was not on their property. The Sideses had the gate removed, which sparked conflict between the Taylors and the Sideses.

Linda testified that, because they had "problems" with the Sideses, the Taylors obtained a survey of the southern border of their property. The survey showed that their property extended south of the old fence to the quarter section line, and therefore, the Taylors began constructing a new fence.

### (b) Old Fence Line

Schaffert testified that the location of the old fence on the northern edge of the disputed property had not changed since he began renting the Sideses' property from its previous owner in the 1980s. He believed the fence was installed shortly after "the flood of [19]35." He stated that the northeast corner of the fence had been torn out at some point before 1989, but that he had reconstructed it shortly after. In doing so, he attempted to keep the new fence where the original fence was located.

Schaffert always believed that the northern boundary of the Sideses' property ran along the old fence. He testified that the prior owners of the Sideses' property and the Taylors' property treated it as such. For example, the prior owner of the Taylors' property often "pump[ed] gravel" from sand pits on the southern part of the Taylors' property, and would "dig[] pits right up next to the [fence] . . . and he didn't cross over, but he got fairly close."

Schaffert also testified that there were no physical markers indicating the northern boundary of the Sideses' property aside from the old fence. When he would allow guests on his property, he would warn them to stay "south of the fence."

In 2003, Schaffert began renting property, including the disputed property, to Robert Lampe, a rancher. When initially planning the arrangement with Lampe, they did not discuss the property boundaries because "the fences were there." Lampe testified that he continued to rent the same property as of the date of the trial, and the old fence was on the property the entire time

he had rented it. He further stated that he always believed the boundary of the Taylors' property to be "where the fence was [because] that's where it's always been" and he had never been informed otherwise.

Lampe testified that he had never moved the location of the fence. In describing the fence, he stated that it was a "barbed wire fence" with "mainly wood posts." He stated that it was sufficient to keep his cattle from entering "the Taylors' side" and rated the quality of the fence a "six, seven" out of 10.

Michael Sides testified that he viewed the fence "prior to closing" when he purchased the Sideses' property from Schaffert, and that he believed the fence constituted the property line between the two parcels.

Linda described the fence as "dilapidated" and stated that they sometimes "ha[d] cattle on [their] property from [Lampe], and [they] would walk them back over the fence." Trevor testified that when they would return Lampe's cows from their property, they did not take them across the quarter section line; they brought them across the fence to the disputed property.

Linda testified that she and her late husband originally purchased the Taylors' property in 2000, and at the time, they "didn't know what the boundary was. The fence was there, but . . . [they] didn't really know." However, Linda stated that she never recognized the fence as the southern boundary of the Taylors' property. She stated that she believed the quarter section line was the true boundary line. Trevor and various members of their family also testified that they did not believe the fence line constituted the boundary separating the Taylors' property from the Sideses' property. Trevor stated that there were other fences on the Taylors' property that served no purpose and did not mark boundary lines between the Taylors' property and neighboring properties.

Trevor, his nephews, and his brother-in-law testified that they used the disputed property for hunting purposes. They stated that they knew how far south of the fence they could travel before crossing the quarter section line because they utilized "onX Maps," a "hunting map" which utilizes GPS technology to "show[] exactly where you can walk." One of Trevor's nephews testified that they began using the "onX Maps app when it came out" in 2013. When Trevor's wife was asked how she knew where to stop before entering the Sideses' property, she stated that "[t]here is not really a boundary, so it was kind of a guesstimate."

(c) Use of Disputed Property

Schaffert characterized the disputed property as "pasture" and stated that when he initially rented the property now owned by the Sideses, he used it as "farm ground." However, he stopped using it as such at some point after purchasing it and began renting it to Lampe in 2003. Schaffert testified that, during the later years of his ownership of the property now owned by the Sideses, he only personally used it "once or twice a year . . . [to] do a little fishing."

Michael Sides testified that he used the disputed property for recreational purposes and continued to rent the Sideses' property to Lampe. Lampe testified that since 2003, when he began renting the property now owned by the Sideses, he used the property, including the disputed property, to "[run] cows on it [and] graze[] it" on a yearly basis, from May through October. He stated that the cattle are only on the property "half the time" because he rotates them between the Sideses' property and his property "to the west." He stated that the rotation depends on whether

the properties have been irrigated and "how long [he] can leave [the cattle] without overgrazing" the properties. He said that the cattle are on the disputed property "forty to fifty percent of the time." Lampe testified that the Taylors had never expressed to him a belief that he was trespassing on their property by using the disputed property. However, the Taylors stated that they refrained from doing so because they did not mind the cattle being on the disputed property.

Linda testified that she had only ever crossed south of the fence line once during a flood in 2008. However, Trevor, his nephews, and his brother-in-law testified that they used the disputed property to go mushroom hunting and for other "hunting purposes." However, when asked whether he ever gave Trevor permission to cross the fence, Schaffert stated, "Yeah, I did. . . . [h]e'd call me . . . and say 'Hey, it's mushroom season. Do you mind?' And 'No.' I said, 'Get me a batch.' You know, and so he'd pick me some." Trevor acknowledged that he had obtained permission from Schaffert to enter the Sideses' property to go mushroom hunting.

Additionally, Michael testified that, since purchasing the property in 2018, he never personally observed the Taylors crossing the fence to the disputed property. He further stated that his son had installed trail cameras on the disputed property and that he was not aware of any photos of the Taylors captured by those trail cameras. He stated that his son would have notified him if the Taylors or other individuals not authorized to be on the disputed property had entered it.

### (d) Maintenance of Disputed Property

Lampe testified that he maintained fences on the property, including the old fence on the northern boundary of the disputed property. He specifically stated that he would "fix[] it when the wires broke" and "put a post in once in a while."

Michael testified that he maintained the disputed property by spraying thistle "twice a year" and "clean[ing] up a lot of . . . dead logs and trees." He also hired an individual to "put in some new posts and stretch[] the wire up" on the old fence along the northern boundary of the disputed property.

Linda and Trevor stated that they had been paying taxes for the disputed property since they purchased it. They further stated that they crossed the fence line to "kill[] thistle" on the disputed property and "tack up" certain parts of the old fence. Trevor acknowledged that Schaffert and Michael maintained the disputed property.

### (e) Dicenta Survey

Douglas Terry testified that he had been employed as a surveyor for "Miller & Associates," an engineering firm which conducts land surveys. He stated that he had 20 years of experience as a surveyor and that "someone" requested a survey of land to be purchased in December 2017. He testified that in December 2017, he completed "the field work" used in completing a survey of the Sideses' property by Gary Dicenta, the county surveyor at the time. The Taylors offered the survey into evidence, which the court received. Terry testified that the survey indicated that the property surveyed, which matched the legal description of the Sideses' property, did not cross north of the quarter section line.

(f) Stevenson Survey

Douglas Stevenson testified that he was employed as a "senior surveyor" by "Olssons Engineering[,] [a] [l]and surveying firm out of Holdrege, Nebraska," and that he had been a "registered land surveyor" since January 1992. Stevenson testified that, in February 2021, he and a "survey crew" conducted a survey of the disputed property using "GPS" technology. He stated that there were no complications in surveying the old fence. The court received into evidence exhibit 22, "A Survey Plat of a Fence[ ][L]ine Located in the NE1/4 of Section 11, T3N, R27W of the 6th P.M., Red Willow County, Nebraska" (the Stevenson survey). The Stevenson survey depicts the fence line as running east to west, beginning slightly north of the quarter section line in the southeast corner of the Taylors' property, then running just north of the section line until dipping south of the quarter section line near the northwest corner of the Sideses' property. It also contains a metes and bounds description of the disputed property, labeled "legal description."

On cross-examination, Stevenson acknowledged a note on the survey report stating that "the existing fence posts and fence line are not in a uniformly straight line and vary 12 inches on either side of the straight line depicted on the survey exhibit." He further stated that "fences, even up to recently, when they're constructed through this type of area, they're not perfectly straight as a string line" and that "a post might deviate a bit side to side." When asked whether the metes and bounds description of the disputed property contained in exhibit 22 is "a precise legal description," Stevenson stated that "it's about as good as you're ever going to get." When asked on redirect examination whether it is "common in [his] profession, when . . . surveying a fence, especially an old fence . . . [to] have a corridor within [a] twelve inch . . . specification," Stevenson responded, "Yes, this is common."

4. DISTRICT COURT'S ORDER

On July 9, 2021, the district court entered an order describing the Taylors' complaint as alleging two causes of action, the first to establish a boundary line between the parties' properties and the second seeking damages for the Sideses' removal of the fence constructed by the Taylors. The court also noted the Sideses' counterclaim seeking ownership of the property through a claim of adverse possession. The court elected to address the Sideses' counterclaim first since its success would render the Taylors' "two causes of action . . . moot."

The district court proceeded to set forth that "[t]he disputed land involved in the present case consists of woodlands and rangeland suitable for grazing livestock and for recreational hunting purposes." It noted that the Sideses' presented evidence from the prior owner, Schaffert, that the fence line on the north side of the disputed property had been treated as the northern boundary of the Sideses' property since he had owned the property in 1991. The court further noted that the Taylors purchased their property in 2000 and that they "presented evidence that they had used the disputed land for occasional recreational purposes to search for mushrooms and deer sheds."

Citing to *Brown v. Morello*, 308 Neb. 968, 957 N.W.2d 884 (2021), the district court set out the elements of adverse possession, specifically, that a party claiming title through adverse possession must prove by a preponderance of the evidence that the adverse possessor has been in (1) actual, (2) continuous, (3) exclusive, (4) notorious, and (5) adverse possession under a claim of ownership for the statutory period of 10 years. And citing to *Matzke v. Hackbart*, 224 Neb. 535,

399 N.W.2d 786 (1987), the court set forth the requirement that the land itself must also be described with enough particularity to enable the court to exact the extent of the land adversely possessed and to enter a judgment upon the description.

The district court then found, without elaborating, that the Sideses had proven they "had actual possession of the disputed property for more than 10 years," had "continuous possession of the disputed property" which had been "continuously exclusive for more than 10 years," had "continuously notorious" possession for more than 10 years, and the Sideses' "possession of the disputed property" had been "adverse to the possession of the [Taylors] for more than 10 years." The court entered judgment quieting title in favor of the Sideses and against the Taylors to the following property:

> Commencing at the East quarter corner of Section Eleven (11), Township Three (3) North, Range Twenty-seven (27), West of the 6th P.M., Red Willow County, Nebraska; thence on an assumed bearing of N00°25'02"E, on the East line of the Northeast Quarter (NE¼) of said Section 11, a distance of 205.22 feet to the point of beginning; thence S89°17'08"W, 331.11 feet; thence N00°25'25"W, 11.91 feet; thence N89°46'14"W, 235.94 feet; thence S07°53'17"W, 14.52 feet; thence S89°32'50"W. 365.57 feet; thence S89°12'13"W, 588.37 feet; thence S89°23'27"W, 281.26 feet; thence S89°48'15"W, 276.23 feet; thence S70°34'50"W,62.05 feet; thence S53°51'33"W, 101.85 feet; thence S53°22'49"W, 53.60 feet to a point on the south line of the Northeast Quarter (NE¼); thence east 2,296.59 feet on the quarter section line to the East quarter corner of said Section 11.

The district court also entered judgment in favor of the Sideses on the Taylors' second cause of action for damages.

The Taylors filed a motion to alter or amend judgment on July 19, 2021, and following a hearing on the motion, the district court entered an order on September 7 denying the motion. The Taylors appealed; however, their initial appeal was dismissed by this court because the district court had not yet entered an order disposing of the Sideses' remaining counterclaims. Thereafter, upon the Sideses' motion to dismiss their remaining counterclaims (for damages and an injunction), the district court entered an order doing so on February 21, 2022, and the Taylors again appealed.

## III. ASSIGNMENTS OF ERROR

The Taylors assign that the district court erred in determining that the Sideses (1) had continuous possession of the disputed property for 10 years, (2) had exclusive possession of the disputed property for 10 years, and (3) provided a sufficient description of the property claimed to be adversely possessed. The Taylors further contend that the court erred by finding in favor of the Sideses on the Taylor's "first" and "second cause[s] of action."

## IV. STANDARD OF REVIEW

A quiet title action sounds in equity. *Burnett v. Maddocks*, 294 Neb. 152, 881 N.W.2d 185 (2016). On appeal from an equity action, an appellate court tries factual questions de novo on the record and, as to questions of both fact and law, is obligated to reach a conclusion independent of

the conclusion reached by the trial court, provided that where credible evidence is in conflict in a material issue of fact, the appellate court considers and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. *Klein v. Oakland/Red Oak Holdings*, 294 Neb. 535, 883 N.W.2d 699 (2016).

## V. ANALYSIS

A party claiming title through adverse possession must prove by a preponderance of the evidence that the adverse possessor has been in (1) actual, (2) continuous, (3) exclusive, (4) notorious, and (5) adverse possession under a claim of ownership for a statutory period of 10 years. *Siedlik v. Nissen*, 303 Neb. 784, 931 N.W.2d 439 (2019). Title cannot be acquired without simultaneous and continuous existence of each element of adverse possession for the required period. *Thornburg v. Haecker*, 243 Neb. 693, 502 N.W.2d 434 (1993).

The Taylors' first two assigned errors claim that the Sideses' possession was not continuous and was not continuously exclusive. We will address those elements of adverse possession in that order.

### 1. Continuous Possession

The Taylors contend that the Sideses did not have continuous possession of the disputed property for 10 years. The term "continuous" in the context of adverse possession means a possession for the 10-year period which is uninterrupted or stretches on without break or interruption. *Wanha v. Long*, 255 Neb. 849, 587 N.W.2d 531 (1998). However, the law of adverse possession does not require the possession to be evidenced by persons remaining continuously upon the land and constantly from day to day performing acts of ownership, and it is sufficient if the land is used continuously for the purposes to which it may be naturally adapted. *Nye v. Fire Group Partnership*, 265 Neb. 438, 657 N.W.2d 220 (2003). To meet the requirement of continuous possession, a plaintiff may tack the possession of predecessors in title. See *Burk v. Demaray*, 264 Neb. 257, 646 N.W.2d 635 (2002) (to tack possession of predecessors in title for purpose of establishing adverse possession, predecessor occupant's possession must have been adverse to true owner).

The Taylors argue that the Sideses' use of the disputed property was merely "recreational." Brief for appellants at 16-17. While that was true as to the Sideses' personal use, the land continued to be rented to Lampe as it had when owned by Schaffert. Schaffert testified that when he initially rented the property in the 1980s from the owner preceding him, he used it as "farm ground." After purchasing the property, he then rented the property Lampe in 2003, and Schaffert thereafter used the property occasionally for recreational purposes. The disputed property was continuously rented to Lampe to graze his cattle from 2003 until the time of trial in May 2021, with Lampe annually using the disputed property to graze his cattle from May to October. A tenant may adversely possess real property in the name of his landlord. *Rush Creek Land & Live Stock Co. v. Chain*, 255 Neb. 347, 586 N.W.2d 284 (1998).

The Taylors argue that Lampe's use of the disputed property was merely "seasonal" because his cattle only occupied the disputed property "about half the time" during the summer and fall seasons. Brief for appellants at 17. In support of their argument, the Taylors cite to *Hardt v. Eskam*, 218 Neb. 81, 352 N.W.2d 583 (1984), where the Nebraska Supreme Court found that

the party claiming adverse possession failed to prove continuous possession because their only use of a property was for annual hunting trips—a "seasonal and recreational use and, therefore, [an] occasional use." *Id*. at 84, 352 N.W.2d 585-86. The Supreme Court found that such use was not sufficient to put the title owner of the property on notice that their title to the real estate was being claimed by adverse possession, particularly since the property was mainly used as pasture.

However, Lampe's use of the disputed property was far more extensive than that of the claimants in *Hardt v. Eskam, supra.* Lampe used the rented property annually from May to October for over 17 years, as of the time of trial. And while the property was not in constant use for such purposes, the law does not require that adverse possession be evidenced by complete enclosure and 24-hour use of the property. *Brown v. Morello*, 308 Neb. 968, 957 N.W.2d 884 (2021). It is sufficient if the land is used continuously for the purposes to which it may be adapted. *Id*. Lampe's use of the disputed property was appropriate, considering the nature of the property. Linda described the disputed property as "rural" and Schaffert termed it a "pasture." Lampe testified that he rotated his cattle between the disputed property and his own property "to the west," depending on whether the properties were adequately irrigated. Lampe further testified that he used the disputed property to the extent that he could "without overgrazing it."

Upon our de novo review of the record, we find that the Sideses and their predecessors in interest had continuous possession of the disputed property for over 10 years.

## 2. EXCLUSIVE POSSESSION

The Taylors next contend that the Sideses' did not have exclusive possession of the disputed property for 10 years. In a claim for adverse possession, possession must be exclusive, and if the occupier shared possession with the title owner, the occupier may not obtain title by adverse possession. *Wanha v. Long, supra*. Where the record establishes that both parties have used the property in dispute, there can be no exclusive possession on the part of one party for the purpose of establishing adverse possession. *Id.*

The Taylors argue that "[a]ny possession of the disputed property by [the Sideses] was undoubtedly shared with [the Taylors]." Brief for appellants at 12. However, the evidence was disputed on the issue of exclusivity. And when there is credible evidence in conflict in a material issue of fact, an appellate court considers and may give weight to the fact that the trial judge heard and observed the witnesses and accepted one version of the facts rather than another. See *Klein v. Oakland/Red Oak Holdings, supra*.

Linda testified that she had only crossed the fence once during a flood in 2008. Trevor and various members of the Taylors' family testified that they "sprayed thistle" and used the disputed property for mushroom hunting and other forms of hunting. Notably, Schaffert testified that he had given the Taylors permission to cross the fence to go mushroom hunting. Additionally, Michael testified that there were trail cameras on the disputed property which never captured photos of the Taylors entering the property.

In its July 9, 2021, order, the district court acknowledged that there was testimony regarding the Taylors' use of the disputed property. However, the court ultimately found that the Sideses and their predecessors in interest had exclusive possession of the disputed property for more than 10 years. Although the court's order did not provide any specific findings as to this element of adverse possession, the testimony of Schaffert and Lampe supports exclusive

possession given the open use of the land for grazing cattle on an annual basis. Schaffert testified that the location of the old fence on the northern edge of the disputed property had not changed since he began renting the property from its previous owner in the 1980s; he always believed that the northern boundary of the property ran along the old fence. He further testified that the owners prior to the Sideses and the Taylors treated the fence as a boundary, giving as an example that the predecessor owner to the Taylors' property pumped gravel from the sand pits on the southern part of the Taylors' property and would dig right up next to the fence, but did not cross over. Schaffert started renting the property to Lampe in 2003, who testified that the fence was sufficient to keep his cattle from entering "the Taylors' side."

It is the established law of this state that when a fence is constructed as a boundary line between two properties, and parties claim ownership of land up to the fence for the full statutory period and are not interrupted in their possession or control during that time, they will, by adverse possession, gain title to such land as may have been improperly enclosed with their own. *McCain v. Cook*, 184 Neb. 147, 165 N.W.2d 734 (1969). It is not necessary that the possession be accompanied by an express declaration of claim of title; it is sufficient if the party in possession has acted so as to clearly indicate he did claim title. *Id*. The intention to claim title is usually manifested by acts, not words. *Id*. The evidence supports that the Sideses and their predecessors in title manifested by their actions the uninterrupted and open use of the disputed property up to the fence line for the purpose of grazing cattle for a period of time well beyond the statutory period. Accordingly, we agree with the district court that the Sideses' possession of the disputed property had been "continuously exclusive for more than 10 years."

We note that the Taylors argue in their reply brief that the Sideses' use of the disputed property was "permissive" because the Taylors "had no issues with [Schaffert] or his tenants utilizing the disputed property for limited grazing purposes." Reply brief for appellants at 10-11. However, there is no evidence in the record that the Taylors or their predecessors granted Schaffert, Lampe, or the Sideses permission to use the disputed property. Lampe specifically testified that the Taylors had never expressed to him a belief that he was trespassing on their property by using the disputed property.

### 3. PARTICULARITY OF DESCRIPTION

The Taylors contend that the Sideses failed to provide a sufficiently particular description of the disputed property.

The land claimed to be adversely possessed must be described with enough particularity to enable the court to exact the extent of the land adversely possessed and to enter a judgment upon the description. See *Schellhorn v. Schmieding*, 288 Neb. 647, 851 N.W.2d 67 (2014). This standard requires that the claimant provide to the trial court a precise legal description rather than general descriptions based on landmarks. *Siedlik v. Nissen*, 303 Neb. 784, 931 N.W.2d 439 (2019). This burden is not met where the metes and bounds of the area claimed would rest on speculation and conjecture. *Inserra v. Violi*, 267 Neb. 991, 679 N.W.2d 230 (2004).

Here, the Sideses offered into evidence the Stevenson survey, which the district court received and used in its order to quiet title of the disputed property in the Sideses. According to Stevenson's testimony, in February 2021, he and a "survey crew" conducted a survey of the disputed property using "GPS" technology. He stated that there were no complications in

surveying the old fence. The Stevenson survey contained a metes and bounds description of the disputed property rather than a general description based on landmarks.

Nevertheless, the Taylors argue that the description contained in the Stevenson Survey still cannot "be deemed an 'exact' or 'definite' legal description" because it contains the following "survey note":

> The intent of this survey was to locate the relative position of the existing fence line at the date of this survey in the NE1/4 of Section 11, T3N, R27W of the 6th P.M., Red Willow County, Nebraska. The existing fence posts and fence line are not uniformly in a straight line and vary 12 inches on either side of the straight line depicted on the survey exhibit.

Brief of appellants at 18-19.

Stevenson, a registered land surveyor since 1992, explained his reasoning for including the survey note. He testified that when fences are "constructed through this type of area, they're not perfectly straight as a string line" and that "a post might deviate a bit side to side." The metes and bounds description was based on the location of the old fence. When asked whether it is "common in [his] profession, when . . . surveying a fence, especially an old fence . . . [to] have a corridor within [a] twelve inch . . . specification," Stevenson stated, "Yes, this is common." He stated that the metes and bounds description was as precise a description of the fence line as is possible.

We find that the disputed property was described with sufficient particularity to enter a judgment upon the description. Therefore, the district court did not err in quieting title to the disputed property in the Sideses.

### 4. Remaining Assigned Errors

The Taylors generally assign that the district court erred in ruling in favor of the Sideses with regard to their "first" and "second cause[s] of action." We have already addressed the Taylors' first cause of action related to quieting title to the disputed property and noted our agreement with the district court's order on that issue. The Taylors' second cause of action seeking damages was based upon their claim that the Sideses trespassed on their property and destroyed the new fence the Taylors had built along the section line. However, this claim was dependent upon a determination that the disputed property was owned by the Taylors, and the decision otherwise renders the Taylors' second cause of action moot.

## VI. CONCLUSION

For the reasons set forth above, we affirm the district court's decision quieting title to the disputed property in the Sideses.

Affirmed.